Larry W. Lee (State Bar No. 228175)
lwlee@diversitylaw.com
Nicholas Rosenthal (State Bar No. 268297)
nrosenthal@diversitylaw.com
Kristen M. Agnew (State Bar No. 247656)
kagnew@diversitylaw.com
**Diversity Law Group, P.C.**
515 South Figueroa Street, Suite 1250
Los Angeles, CA 90071
(213) 488-6555
(213) 488-6554 facsimile

Attorneys for Plaintiff and the Class
(Additional Counsel on Next Page)

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SER LAO, as an individual and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br>   vs.<br><br>H & M HENNES & MAURITZ, L.P., a New York limited partnership; and DOES 1 through 50, inclusive,<br><br>        Defendants. | Case No. 5:16-cv-333 EJD<br><br>**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:       TBD<br>Time:      TBD<br>Courtroom:  4, 5th Floor<br>Judge:     Hon. Edward J. Davila |

William L. Marder (State Bar No. 170131)
bill@polarislawgroup.com
**Polaris Law Group LLP**
501 San Benito Street, Suite 200
Hollister, CA 95023
(831) 531-4214
(831) 634-0333 facsimile

Dennis S. Hyun (State Bar No. 224240)
dhyun@hyunlegal.com
**Hyun Legal, APC**
515 South Figueroa Street, Suite 1250
Los Angeles, CA  90071
(213) 488-6555
(213) 488-6554 facsimile

Attorneys for Plaintiff and the Class

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Pursuant to Rule 201 of the Federal Rules of Evidence, Plaintiff Ser Lao ("Plaintiff") respectfully requests that the Court take judicial notice of the following documents:

1.     The California Division of Labor Standards Enforcement's (the "DLSE") Opinion Letter 2002.05.17, a true and correct copy of which is attached hereto as "Exhibit A."

2.     The DLSE Opinion Letter 2008.07.07, a true and correct copy of which is attached hereto as "Exhibit B."

3.     The DLSE's Opinion Letter 2008.07.07-2, a true and correct copy of which is attached hereto as "Exhibit C."

4.     The Reporter's Transcript of Proceedings on the hearing held on June 30, 2016, before the Honorable Beth Labson Freeman on Plaintiff Isaac Rodriguez's Motion for Class Certification in the case, *Rodriguez v. Nike Retail Servs.*, 2016 U.S. Dist. LEXIS 110961, at *24 (N.D. Cal. Aug. 19, 2016), a true and correct copy of which is attached hereto as "Exhibit D."

5.     Magistrate Judge Nathanael M. Cousins' Order Granting Plaintiff Eric Chavez's Motion for Class Certification in *Chavez v. Converse, Inc.*, 15-cv-03746-NC, Dkt. No. 89 (N.D. Cal. Sept. 22, 2016), a true and correct copy of which is attached hereto as "Exhibit E."

Federal Rule of Evidence 201 permits the Court to take judicial notice of "matters of public record" as long as the facts are not "subject to reasonable dispute." *Wheeler v. City of Oakland*, 2006 U.S. Dist. LEXS 27680 at *5-16 (N.D. Cal. Apr. 28, 2006) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)); *see also Mullis v. U.S. Bankruptcy Court*, 828 F.2d 1385, 1388 n.9 (9th Cir. 1987). Opinion letters and administrative publications, such as the above-listed documents, are the type of documents that are properly noticed under Rule 201. *See*, *e.g.*, *Pace v. PetSmart Inc.*, 2014 U.S. Dist. LEXIS 77727, at *5 (C.D. Cal. June 3, 2014) (granting the party's request to take judicial notice of DLSE opinion letters); *Holak v. Kmart Corp.*, 2012 WL 6202298, *6 n.3 (E.D. Cal. Dec. 12, 2012) (same); *Cardenas v. McLane FoodServices, Inc.*, 796 F. Supp. 2d 1246, 1252 (C.D. Cal. 2011) (same); *Akaosugi v. Benihana Nat'l Corp.*, 282 F.R.D. 241, 259 (N.D. Cal. 2012) (same).

1    DATED: June 22, 2017                    DIVERSITY LAW GROUP, APC

2

3                                            By:_____/s/ Larry W. Lee_____
                                                           Larry W. Lee
4                                            Attorneys for Plaintiff and the Class

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

# EXHIBIT A

DEPARTMENT OF INDUSTRIAL RELATIONS
**DIVISION OF LABOR STANDARDS ENFORCEMENT**
*LEGAL SECTION*
320 W. 4th Street, Suite 430
Los Angeles, CA  90013
(213) 897-1511



ANNE STEVASON, *Acting Chief Counsel*

May 17, 2002

Richard J. Simmons
Sheppard, Mullin, Richter & Hampton
333 South Hope Street, 48th Floor
Los Angeles, California 90071-1448

Re: Labor Code §226 -- Semi-Monthly Pay Periods for
Non-Exempt Salaried Employees

Dear Mr. Simmons:

This is in response to your letter of January 2, 2002, concerning the application of Labor Code section 226 to the use of semi-monthly pay periods for non-exempt salaried employees. You state that your client pays its non-exempt salaried employees twice each month, and that they are paid 1/24th of their annual salaries on each payday.  The paydays are the 15th (or last working day before the 15th) and the last working day of each month.  As is the case with all semi-monthly payrolls, the number of actual work days and thus, non-overtime work hours, varies from pay period to pay period.

You further state that "adjustments for overtime pay and missed work are incorporated within the paycheck for the following payday," which you assert is "as specified in Labor Code section 204."  These "adjustments," are based on an hourly rate, which you explain is computed by dividing the annual salary by 2,080 hours (i.e., 40 hours per week X 52 weeks per year).

Next, you state that your client, in seeking to comply with Labor Code section 226's requirement for listing hours worked on the itemized statement attached to a paycheck, lists 86.67 hours as the hours worked per semi-monthly pay period, unless the employee works overtime or misses work.  The 86.67 hours is based on dividing the total number of non-overtime hours in a year (2,080) by the number of pay periods in a year (24).  You acknowledge, however, that because the number of work days and non-overtime work hours consistently varies from one semi-monthly

2002.05.17

Richard J. Simmons
May 17, 2002
Page 2

pay period to another, pay periods never consist of precisely
86.67 hours. Yet, you suggest that because the hourly rate (also
known as the "regular rate of pay" for purposes of computing
overtime compensation) is calculated by dividing the annual
salary by 2,080 hours, "it will confuse employees" if your client
were to use a number other than 86.67 hours as the number of non-
overtime hours worked each pay period.

It seems that some of this confusion is caused by your
client's use of semi-monthly instead of bi-weekly pay periods
(which do not result in varying amounts of scheduled non-overtime
hours), and your client's practice of issuing pay checks on the
last day of the pay period (thereby necessitating "adjustments"
for missed work or for overtime), rather than issuing paychecks
after the close of the pay period within the time permitted by
Labor Code §204, with all appropriate deductions for missed work
and extra payments for overtime encompassed in those paychecks.
To be sure, the use of semi-monthly pay periods and payment of
employees on the last day of the pay period are lawful pay
practices. However, the confusion that may be caused by
following such lawful practices cannot be ameliorated by non-
compliance with the explicit requirements of Labor Code §226,
namely: 1) the obligation to list "the total hours worked by the
employee" during the period for which the employee is paid, and
2) the obligation to list "all applicable hourly rates in effect
during the pay period and the corresponding number of hours
worked at each hourly rate by the employee."

Labor Code §204 provides, in relevant part, that wages
earned during the course of employment must be paid no less
frequently than "twice during each calendar month, on days
designated in advance by the employer as regular paydays. Labor
performed between the 1st and 15th days, inclusive, of any
calendar month shall be paid for between the 16th and the 26th of
the month during which the labor was performed, and labor
performed between the 16th and last day inclusive, of any
calendar month shall be paid for between the 1st and 10th day of
the following month." However, not all wages earned during the
pay period must be paid on the next regular payday, as section
204 further states: "Notwithstanding any other provision of this
section, all wages earned for labor in excess of the normal work
period shall be paid no later than the payday for the next
regular payroll period." The term "labor in excess of the normal
work period" means all non-regularly scheduled overtime. All
other hours worked - i.e., all non-overtime work and all
regularly scheduled overtime - does not constitute "labor in
excess of the normal work period" within the meaning of section
204, and thus, must be paid on the payday for the pay period in
which the work was performed.

2002.05.17

Richard J. Simmons
May 17, 2002
Page 3

Your client's practice of paying its employees on the last day of the pay period, rather than sometime during the 10 or 11 day period after the end of the pay period (as permitted by Labor Code §204), is clearly authorized by Labor Code §219, which provides: "Nothing in this article shall in any way limit or prohibit the payment of wages at more frequent intervals, or in greater amounts, or in full when or before due. . . ."

As a general rule, the obligation to list the total hours worked during the pay period can only be satisfied by listing the precise, actual number of hours worked.  The only express exception to this requirement is that hours worked need not be listed for "any employee whose compensation is solely based on a salary *and who is exempt from payment of overtime under subdivision (a) of section 515 or any applicable order of the Industrial Welfare* Commission."  (Labor Code §226(a)(2), emphasis added.)  With the enactment of AB 2509, the Legislature amended Labor Code §226 to require the listing of hours worked for all non-exempt employees, whether they are paid by salary, commission, piece rate, or on an hourly basis.  The reason for this requirement is simple enough--it is designed to provide the employee with a record of hours worked, and to assist the employee in determining whether he has been compensated properly for all of his or her hours worked.  The failure to list the precise number of hours worked during the pay period conflicts with the express language of the statute and stands in the way of the statutory purpose.  Thus, the answer to the first question posed by your letter -- whether it is permissible under section 226 to list 86.67 hours in the itemized wage statement when that is not a precise reflection of the number of hours worked in the pay period -- is no, this practice violates Labor Code §226.

Prior to the enactment of AB 2509, Labor Code §226 did not apply to any employees who were paid by salary, even if they were non-exempt.  But with the amendment of section 226, which took effect on Janaury 1, 2001, the procedure followed by your client of listing "averaged" hours each pay period that do not reflect actual hours worked became unlawful.  Although we do not read section 226 as prohibiting an employer from paying its employees in advance of the date that wages are due under Labor Code §204, it is fairly obvious that such advance payments (if made on the last day or prior to the last day of the pay period) would make it impossible for the employer to accurately list all hours worked (as some of those hours would not yet have been worked) on the itemized wage statement attached to the paycheck.  We can think of two possible solutions to this dilemma.  Of course, the simplest solution would be to change the paydays so that paychecks are issued after the close of the pay period, within the time permitted under section 204, so as to allow the employer to accurately list all hours worked during the pay period.

2002.05.17

Richard J. Simmons
May 17, 2002
Page 4

Alternatively, if the employer decides to continue its practice of making advance payments, it would still need to list the "total hours worked" during the pay period, which would have to include both the hours that were worked prior to the time the paystub is prepared, and the scheduled hours yet to be worked for the remainder of the pay period.  Obviously, to the extent that these "hours worked" would be based, in part, on a projection of hours not yet worked, the paystub attached to the next regular paycheck should contain a category showing corrections to hours worked that were listed on the prior paystub.  These "corrections" should reflect missed scheduled work that had been listed as "hours worked" on the prior paystub, and unscheduled overtime work that had not been listed as "hours worked" on the prior paystub.  Any corrections set out in a subsequently issued paystub must state the inclusive dates of the pay period for which the employer is correcting its initial report of hours worked.

You also ask whether the requirement of section 226(a)(9) for listing "all applicable hourly rates in effect during the pay period" can be satisfied by reporting one hourly rate each pay period (i.e., that determined by dividing the annual salary by 2,080 hours) even though the number of work days and non-overtime hours varies from one pay period to another.  The hourly rate for a non-exempt salaried employee must be determined in accordance with Labor Code §515(d), which codifies the DLSE enforcement practice that was upheld in *Skyline Homes v. Department of Industrial Relations* (1985) 165 Cal.App.3d 239.  Labor Code §515(d) provides: "For purposes of computing the overtime rate of compensation required to be paid to a non-exempt full time salaried employee, the employee's regular hourly rate shall be 1/40 the employee's weekly salary."  A non-exempt full time[1] employee compensated by an annual salary would have his or her weekly salary determined by dividing the annual salary by 52, and then, the hourly rate would be determined by dividing that weekly salary by 40, i.e, the annual salary would be divided by 2,080.  Thus, the "applicable hourly rate," within the meaning of section 226(a)(9), would remain constant as long as the full-time employee's annual salary remains unchanged, regardless of variations in the number of workdays and non-overtime work hours in each semi-monthly pay period.

---

[1] For purposes of computing the regular hourly rate of pay, the term "full time employment" means employment in which the employee is employed for 40 hours per week.  (Labor Code §515(c).)  In accordance with *Skyline Homes*, the regular hourly rate of a part time non-exempt salaried employee would be determined by dividing the employee's weekly salary by the number of weekly hours the employee is regularly scheduled to work.  For example, a non-exempt employee who is employed to normally work 30 hours a week, and who is paid a salary of $600 a week, is employed at a regular hourly rate of $20 per hour.

2002.05.17

Richard J. Simmons
May 17, 2002
Page 5

   To minimize the possibility of confusion on the part of any
non-exempt salaried employee, it may be advisable for the
employer to specify, on the itemized wage statement, that this
hourly rate is based on the employee's annual (or monthly, or
weekly) salary, and to then set out the amount of that salary.
The employer may further choose to specify that overtime pay,
based on this hourly rate, is required for all hours worked in
excess of 8 in any workday or 40 in any workweek, and that
otherwise, this salary is deemed to compensate the employee for
all non-overtime hours worked, and that the amount of non-
overtime hours worked will vary each semi-monthly pay period.

   By way of example: Assume a full-time non-exempt employee is
paid a salary of $52,000 a year.  The regular hourly rate is
determined by dividing that annual salary by 52, for a weekly
salary of $1,000, and dividing that by 40, for a regular rate of
$25 an hour.  Overtime must be paid at the rate of $37.50 an hour
for those hours for which the employee is entitled to one and a
half times the regular rate, and at $50 an hour for those hours
for which the employee is entitled to twice the regular rate.
This employee is paid 1/24 of his annual salary, $2,166.67, each
semi-monthly pay period for all scheduled non-overtime work,
despite the fact that the amount of scheduled non-overtime varies
from semi-monthly pay period to semi-monthly pay period.   In
accordance with Labor Code §204, all overtime worked during the
pay period must be paid, no later than the payday for the next
regular pay period, at the rate of $37.50 or $50 an hour, as
applicable.  Please note, however, that while Labor Code §204
permits this brief delay in payment of overtime, Labor Code §226
requires that all hours worked, including overtime hours, shall
be listed as part of the itemized wage and deduction statement
attached to the paycheck issued for the pay period in which the
work was performed--i.e., there cannot be a delay in reporting
overtime hours worked.  We would thus recommend that if the
overtime hours are not paid until the pay period following the
pay period in which they are worked and reported, that the
employer advise the employees, in writing on the itemized wage
and deduction statement, that the overtime hours worked in this
pay period will be paid on the next paycheck.

   Other issues are presented by the "adjustments," at the
employee's regular hourly rate, for missed non-overtime work.  We
will caution you by quoting from an opinion letter authored by
then Labor Commissioner Lloyd W. Aubry, Jr. on April 27, 1987:

      Your client's plan to pay wages bi-monthly without
      regard to number of days actually worked and then
      deduct any overpayments; i.e., for time not worked
      during the previous pay period, from the subsequent pay
      period, would not be violative of Section 204. However,

2002.05.17

Richard J. Simmons
May 17, 2002
Page 6

      any deductions representing overpayments made for the
previous pay period should be agreed to in writing by
the affected employee and specify the pay period, the
date or dates and reason for the lost time, i.e.,
unearned or unauthorized vacation, illness not covered
by sick leave, etc.

Absent such voluntary written authorization, we would view these
"adjustments" as violative of Labor Code §221 and inconsistent
with *CSEA v. State of California* (1988) 198 Cal.App.3d 374.

    You next ask whether the requirements of section 226 could
be met, as to employees who receive "adjustments" for overtime
work or missed work in the paycheck issued following the pay
period during which the work was performed (or missed), by
providing those employees, on the day they are paid, with a copy
of their time records or time cards disclosing their actual hours
worked.  As discussed above, section 226 requires that the
employer list the employee's *total hours worked* during the pay
period for which the employee is being paid -- *total hours worked*
necessarily includes all actual non-overtime hours and all
overtime hours worked.  Section 226 expressly requires an
"itemized statement in writing showing ... total hours worked."
Time cards or other time records, if attached to a paycheck,
would satisfy section 226's requirement for a statement of *total
hours worked* if the *total hours worked* during the pay period are
separately listed on the time cards or other time records prior
to the time these records are provided to the employee.  If it is
left to the employee to add up the daily hours shown on the time
cards or other records so that the employee must perform
arithmetic computations to determine the *total hours worked*
during the pay period, the requirements of section 226 would not
be met.

    Finally, you ask whether the $4,000 limit on penalties in
Section 226(b) is a limit on the total liability that an employer
can face regardless of the number of employes involved (i.e.,
$4,000 per employer), or whether it is a maximum of $4,000 per
employee (e.g., an employer with 10 employees would face a
maximum liability of $40,000).  Prior to the passage of AB 2509,
section 226(b) provided: "Any employee suffering injury as a
result of a knowing and intentional failure by an employer to
comply with subdivision (a) shall be entitled to recover all
actual damages or $100, whichever is greater, plus costs and
reasonable attorney fees."  The statute now provides: "Any
employee . . . shall be entitled to recover the greater of all
actual damages or $50 for the initial pay period in which a
violation occurs and $100 per employee for each violation in a
subsequent pay period, not exceeding an aggregate penalty of
$4,000, and shall be entitled to an award of costs and reasonable

Richard J. Simmons
May 17, 2002
Page 7

attorney's fees."

The maximum "aggregate penalty" that the statute now references is one that, based on the plain language of the statute, is owed to "any employee." It is not a maximum for *all of the employer's employees.* Indeed, the latter interpretation flies in the face of AB 2509's legislative history, and in particular, the final Senate bill analysis which explains that the bill "entitles an aggrieved employee . . . to the greater of actual damages or penal damages . . . up to $4,000." To interpret this statute as establishing a $4,000 maximum penalty for an employer, rather than a $4,000 maximum penalty per aggrieved employee, would fail to provide any sort of meaningful compensation to the employees of a large employer. Such an interpretation would fail to effectuate the purpose of this law.

Thank you for your ongoing interest in California wage and hour law. Feel free to contact us with any other questions.

Sincerely,


Anne Stevason
Acting Chief Counsel


AS/mel


cc: Arthur Lujan
    Tom Grogan
    Assistant Chiefs
    Regional Managers
    DLSE Attorneys
    Bridget Bane, IWC

2002.05.17

# EXHIBIT B

STATE OF CALIFORNIA                                                                     Arnold Schwarzenegger, *Governor*

**DEPARTMENT OF INDUSTRIAL RELATIONS**
**DIVISION OF LABOR STANDARDS ENFORCEMENT**
455 Golden Gate Avenue, 9th Floor
San Francisco, California  94102
(415) 703-4863
(415) 703-4806 fax



*ANGELA BRADSTREET, STATE LABOR COMMISSIONER*

**ROBERT R. ROGINSON**
Chief Counsel

July 7, 2008

Carl Morris
National Debit Card Manager
American EPay, Inc.
8420 W. Bryn Mawr Ave., Suite 510
Chicago, Illinois  60631

Daniel P. Schwallie
Hewitt Associates, LLC
Crown Center
5005 Rockside Road
Independence, Ohio  44131

Re: <i>Payroll/Debit Cards – Payment of Wages Labor Code §§ 212 and 213</i>

Dear Messrs. Morris & Schwallie:

This letter is in response to your respective letters requesting an opinion from this office on the question whether the use of "payroll debit cards" (American EPay) and "paycards" (Hewitt Associates) through your respective company's payroll distribution services complies with California law, and specifically Labor Code § 212 which governs the manner of payment for wages.

In both your respective letter requests and subsequent conversations with our office, the wage payment methods described use of respective payroll cards which are issued pursuant to agreements between your companies and national banks.[1]  Employers (clients of your services) deposit employee payroll using a direct deposit method into individual employee accounts at a

---

[1] The term "payroll card" will be used to describe both types of cards used by the companies discussed herein. The payroll card is a type of stored value (or prepaid) card which contains or represents an amount of pre-loaded value. Examples of prepaid cards include gift cards, phone cards, travel cards. Stored value cards can be structured under either a closed system (accepted at a single merchant or entity) or an open system (accepted by multiple merchants or entities), the latter which requires a payment systems network for collecting and processing. Stored value cards can be structured to function like debit cards. A debit cards is a payment card that debits a designated bank account upon settlement of a transaction (e.g. to withdraw or transfer funds such as in retail purchases, ATM withdrawal) which is authorized by the user by signature or by entering a personal identification number (PIN). Payroll cards are usually proprietary but may also be "nationally branded" with a Visa or MasterCard brand logo which allows not only ATM or specific merchant withdrawals but also allows for purchasing and receiving cash from numerous merchants or other entities like a traditional debit card. The payroll cards described in this opinion are open system, branded cards utilizing debit card features.

Carl Morris
Daniel P. Schwallie
July 7, 2008
Page 2

bank which is an FDIC member. Employees are provided a plastic card which is magnetically or electronically encoded with account information which allows employees access to funds from their respective accounts. On the scheduled pay day, the employee has immediate access to their full wages (one transaction without fee per payroll period). Employees are *not required* to use your pay distribution programs and may elect to receive their payroll by direct deposit in an account at their own bank or credit union.

Your letters described the cards as a convenient and prompt means of access to an employee's full wages due and payable on a scheduled pay day. Under the programs offered by the respective companies, the payroll card may be used at any VISA-member financial institution. While there are program differences between the two payroll card systems, both have the above-described major features in common.

This analysis first states the major statutory provisions for payment of wages and this agency's previous interpretations regarding earlier similar programs followed by a discussion of recent developments in federal regulation of payroll card accounts. The analysis will then analyze the described programs under the relevant wage payment provisions.

Requirements Regarding the Manner of Payment of Wages

California Labor Code § 212 states, in relevant part:

> (a) No person, or agent or officer thereof, shall issue in payment of wages due, or to become due, or as an advance on wages to be earned:
>
> (1) Any order, check, draft, note, memorandum, or other acknowledgment of indebtedness, unless it is negotiable and payable in cash, on demand, without discount, at some established place of business in the state, the name and address of which must appear on the instrument, and at the time of its issuance and for a reasonable time thereafter, which must be at least 30 days, the maker or drawer has sufficient funds in, or credit, arrangement, or understanding with the drawee for its payment.
>
> (2) Any scrip, coupon, cards, or other thing redeemable, in merchandise or purporting to be payable or redeemable otherwise than in money.

A plain reading of Labor Code § 212(a) establishes a broad prohibition against payment of wages by (non-cash) methods using instruments *unless* such instrument complies with the

Carl Morris
Daniel P. Schwallie
July 7, 2008
Page 3

conditions stated in subsection (a)(1),[2] and further, is not "[a]ny scrip, coupon, cards, or other thing redeemable, in merchandise or purporting to be payable or redeemable otherwise than in money" as proscribed in subsection (a)(2).

Labor Code § 213 states specific limitations on §212 and provides, inter alia,

> Nothing contained in Section 212 shall:
>
> ...
> (d) Prohibit an employer from depositing wages due or to become due or an advance on wages to be earned in an account in any bank, savings and loan association, or credit union of the employee's choice with a place of business in this state, provided that the employee has voluntarily authorized that deposit. If an employer discharges an employee or the employee quits, the employer may pay the wages earned and unpaid at the time the employee is discharged or quits by making a deposit authorized pursuant to this subdivision, provided that the employer complies with the provisions of this article relating to the payment of wages upon termination or quitting of employment.

DLSE previously opined that a program conceptually similar to the instant proposals complied with the requirements of the Labor Code. (O.L. 1994.02.03-1) In that opinion letter, the Citibank PayTM service was described as an electronic alternative for payment of wages to employees where employees voluntarily participated in the wage payment program. Under the program, an employer offers the service to its employees who apply to open a PayTM account. Upon acceptance of the account application by Citibank, the employee would be issued a PayTM card and the employee's pay would be *directly deposited* to the employee's account. Thereafter, the employee can access his or her funds through use of the pay card using a personal identification number (PIN) at any of the hundreds of ATMs and point-of-sale (POS) locations.

The 1994 opinion letter analyzed the Citibank program by reading Labor Code § 213 in light of the provisions of Labor Code § 212. Significantly, the letter stated that PayTM card "would be *the instrument which is negotiable and payable in cash on demand*, without discount at an established place of business (i.e., ATMs)..." ((O.L. 1994.02.03-1, p. 2) The letter concluded that, subject to Citibank's waiver of any right to extraterritorial service for subpoenas for bank records regarding the accounts, DLSE would be able to opine that the service "complies with California law." (*Id.,* at p.3) Similarly, DLSE previously opined that a payroll service program

---

[2] DLSE has historically viewed the wage payment laws as requiring payment of wages in cash or by instrument negotiable in cash without discount upon demand. (DLSE Enforcement Policies and Interpretations Manual, § 9.1.1) The Labor Code does not specifically define the terms "instrument" or "negotiable" which are terms used in Labor Code § 212(a). The ordinary meaning of the word "instrument" is "a writing or document" (See Black's Law Dictionary, 5th ed., 1979, p. 720) The word "negotiable" means "[l]egally capable of being transferred by endorsement or delivery. Usually said of checks and notes and sometimes of stocks and bearer bonds." (*Id.,* p. 933), or, "legally transferable to another by endorsement or by proper delivery (said of promissory notes, checks, etc.)..." (Webster's New World College Dictionary, 4th ed, 2005, p. 964).

Carl Morris
Daniel P. Schwallie
July 7, 2008
Page 4

offered to companies employing over-the-road truck drivers which allows all or any portion of wages to be transferred by *direct deposit* to the drivers bank account and such wages could be distributed to the driver on the road (both through ATM machines or drafts without incurring charge) met the requirements of Labor Code § 212(a). (O.L. 1997.10.21)

While the conclusions of the described opinion letters appear appropriate, clarification of the analysis is warranted given the language in both Labor Code §§ 212 and 213 as well as developments in the law and practice regarding the use of payroll card programs.

Developments in Payroll Card Regulation

The technology explosion in the last 20 years has often outpaced the ability of federal and state governments to keep up with private industry advances in conducting business. Although the use of electronic "payroll cards" has been around for some time (as illustrated by the above described opinion letters), it has only recently been expressly regulated under specific federal law.

The federal Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693 et seq., enacted in 1978, provided a basic framework establishing rights, liabilities and responsibilities of participants and consumers involved in electronic fund transfer systems and financial institutions that offer these services. (12 CFR § 205.1(b)) Although EFTA was enacted many years ago, the internet has drastically increased the number of electronic transactions and importance of the Act.

EFTA is implemented and administered by the Board of Governors of the Federal Reserve System (FRB) through "Regulation E" (12 CFR Part 205) which has a primary objective of protecting individual consumers engaging in electronic fund transfers. (12 CFR 205.1(b)) Regulation E broadly defines an "electronic fund transfer" as "any transfer of funds that is initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account." (12 CFR § 205.3(b)). The most common types of covered transactions are those involving *debit cards*, *direct deposits*, ATM transfers, and *preauthorized debits* from a consumer's bank account, and point-of-sale transfers. (*Id.,* italics added) Regulation E provides for initial and subsequent disclosures, issuance of access devices, liabilities of consumer for unauthorized transfers, changes in terms and required notice, receipts/statements, pre-authorized transfers, error resolution procedures, and enforcement by federal agencies.

Prior to July 2007, EFTA covered only electronic fund transfers in and out of a *consumer's personal* bank account and not to a business account. Effective July 1, 2007, the FRB expressly made electronic "payroll cards" subject to the EFTA. A covered account now includes a "'payroll card account' which is an account that is directly or indirectly established through an employer and to which electronic fund transfers of the consumer's wages, salary, or other employee compensation (such as commissions) are made on a recurring basis, whether the account is operated or managed by the employer, a third party payroll processor, a depository institution or any other person..." (12 CFR § 205.2(b)(2))

Carl Morris
Daniel P. Schwallie
July 7, 2008
Page 5

It is evident that the payroll card and its electronic-based means of accessing and transferring funds is now clearly aligned with other electronic transaction or payment methods such as debit cards and direct deposits covered under FRB's Regulation E requirements. Moreover, the activities regulated under EFTA are distinguishable from the rights, obligations, and remedies available for negotiable instruments which are largely governed by Article 3-Negotiable Instruments of the Uniform Commercial Code (UCC).[3]

It is clear from the language in Labor Code § 213(d) that the Legislature specifically authorized wage payments using direct deposit and prescribed the conditions for such payment method, and further, that Labor Code § 212 cannot be read to prohibit such wage payment method. Accordingly, the conditions for payment of wages using a negotiable instrument have been viewed as independent of the conditions for payment by direct deposit in financial institutions. (See O.L. 1996.11.12 [payment by check delivered directly to the worker is different from a direct deposit in a banking-type institution which is why the Legislature provided one rule for one method and another rule for the second].)

The payroll card programs utilize *both* a direct deposit of wages under an employer sponsored service which is beyond the traditional payment into an employee's personal bank account *and* a means of access to those wages using an electronic card. Based upon the described developments in federal regulation of payroll cards used to pay an employee's wages using direct deposit as a component of a payroll card system and, in view of the distinction between conditions for wage payments by negotiable instrument and direct deposit treated differently under both general laws and wage payment provisions, it is appropriate to first view the subject programs for compliance with Labor Code § 213(d) because the payroll card uses a method of wage payment *involving direct deposit.*

Direct Deposit Under Labor Code § 213(d)

As previously stated, Labor Code § 213(d) expressly authorizes an employer to deposit "wages due or to become due or an advance on wages to be earned in an account in any bank, savings and loan association, or credit union of the employee's choice with a place of business in this state, provided that the employee has voluntarily authorized that deposit."

---

[3] We could find no authority definitively stating that a "payroll card" or "debit card" is a "negotiable instrument" as defined under Article 3 – Negotiable Instruments in the UCC (codified in California Commercial Code §§ 3101 et seq.) A negotiable instrument is "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order if it is all of the following: (1) Is payable to bearer or to order at the time it is issued or first comes into the possession of a holder. (2) Is payable on demand or at a definite time. (3) Does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, ..." (Commercial Code §3104(a)) One federal agency has opined that stored value cards (of which payroll cards are a subspecies) are *not* negotiable instruments since they do not satisfy the definitional requirements under the UCC. (FDIC General Counsel's Opinion No. 8, "Stored Value Cards," 61 Fed Reg. 40490, Aug. 2, 1996 [determining that some stored value systems are "deposits" within the meaning of the Federal Deposit Insurance Act and therefore assessable and qualify for deposit insurance].)

Carl Morris
Daniel P. Schwallie
July 7, 2008
Page 6

Employee choice is thus a fundamental condition for payment methods utilizing direct deposits under California wage payment law. Also, the optional nature of an employee's participation is further mandated under FRB's Regulation E which states: "*No financial institution or other person* may require a consumer to establish an account for receipt of electronic fund transfers with a particular institution as a condition of employment or receipt of governmental benefit." (12 CFR § 205.10(e); italics added)

In both described programs, the employer directly deposits payroll into an individual employee's account established at the program bank. Employees continue to have the option of having their pay directly deposited into an account of their choosing at some other financial institution (bank, savings and loan association, or credit union). Since an employee's participation in the payroll card program is optional and provided that the employee has voluntarily and specifically authorized the deposit, the payroll card programs simply provide another *alternative* for employees to receive their wage payments by direct deposit. Thus, the two programs sufficiently satisfy the voluntary requirement in Labor Code § 213(d).[4]

Additionally, Labor Code § 213(d) requires that the deposit be made in any bank, savings, and loan association, or credit union "with a place of business in this state." By its terms, the requirement does not mandate that the deposit be made in California, but simply that the financial institution has a place of business in California. The terms "place of business" is not specifically defined; thus, as with any interpretation of a statutory or regulatory provision, the language must be read as a whole giving words their ordinary meaning. (*Fitch v. Select Products Co.* (2005) 36 Cal.4th 812, 818) The ordinary meaning of the word "place" in its noun form includes a "building or space devoted to a special purpose [a *place* of amusement]" (Webster's New World College Dictionary, 4th ed., 2005, p. 1099) The noun form of the word "business" includes "the buying and selling of commodities and services; commerce; trade...a commercial or industrial establishment; store, factory, etc....the trade or patronage of customers". (Webster's New World College Dictionary, 4th ed., 2005, p. 1099) When read together, the ordinary meaning of "place of business" denotes a location such as a building, space, or establishment devoted to the purpose or use of conducting one's commerce, trade or patronage of customers.

Given the ordinary meaning of "place of business" as discussed above, an employer's place of business may not be on property it owns or controls and should not be interpreted as limited to such locations. Business is now conducted in many different forms which vary extensively beyond the traditional fixed location. It follows from this recognition and the inherent electronic nature of the bank's direct deposit transaction involving the transfer of pay between a California employer to the bank which maintains an account for the employee, the presence of a branch office of the bank in California is not determinative for establishing a "place of business" for purposes of performing

---

[4] Since payroll card accounts are now subject to the FRB's Regulation E, employees are now protected under the federal EFTA for electronic transactions into and out of the account to the same extent as any other consumer using direct deposits at financial institutions which include, but is not limited to, initial and subsequent disclosure requirements, limits on liability, error resolution, changes in terms and required notice, receipts/statements, pre-authorized transfers, etc., as previously described.

Carl Morris
Daniel P. Schwallie
July 7, 2008
Page 7

direct deposit under Labor Code § 213(d). The bank utilizes electronic fund transfers to both collect the wage deposit from the employer and provide employee access to and actual receipt of cash through VISA-member financial institutions and ATMs throughout California. The banks thus have a sufficient presence of their banking business in California for purposes of Labor Code § 213(d) based upon the banks use of established electronic payment networks for ultimate receipt of wages by California workers at locations in California.

It deserves noting that the two banks in the subject requests (National City and JP Morgan Chase) are "national banks" which are part of the national banking system and regulated by the Office of the Comptroller (OCC) in the U.S. Department of the Treasury. As the administrator of national banks, OCC charters, regulates and supervises all national banks and is charged with ensuring a stable and competitive national banking system. Under OCC regulation, a national bank shall not be considered located in a State solely because it physically maintains technology, such as a server, in that state, or because bank products or services are accessed through electronic means by customers located in the state. (12 CFR § 7.5008) However, our above analysis for determining "place of business" is made for purposes of California's wage payment provision in Labor Code § 213(d) only, and does not determine that the subject banks are "located" in the State for federal regulatory purposes or any other purpose.[5]

Labor Code § 212 and Other Wage Laws Requiring Prompt and Full Payment of Wages

The compliance of the *direct deposit* aspect of the payroll card program under Labor Code § 213(d), however, only partially resolves compliance with the wage payment laws. Following deposit of wages into the payroll card account, another component part of the payment program— namely effective *access* to the wage funds using the payroll card which results in the employees actually obtaining and using such funds must be determined under other wage payment provisions.

---

[5] DLSE recognizes that the OCC has determined that national banks offering payroll cards and other pre-paid payment services are part of the business of banking activities authorized for national banks. (See, OCC Advisory Letter, AL-2004). Also, a national bank is expressly authorized to "disburse to an employee of a customer payroll funds deposited with the bank by the customer, and further may, disburse those funds by direct payment to the employee, by crediting an account in the employee's name at the disbursing bank, or by forwarding funds to another institution in which an employee maintains an account." (12 CFR § 7.1011) Federal regulations further state:

(c) State laws. As a general rule, and except as expressly provided by Federal law, State law is inapplicable to a national bank's conduct of an authorized activity through electronic means or facilities if the State law, as applied to the activity, would be preempted pursuant to traditional principles of Federal preemption derived from the Supremacy Clause of the U.S. Constitution and applicable judicial precedent. Accordingly, State laws that stand as an obstacle to the ability of national banks to exercise uniformly their Federal authorized powers through electronic means or facilities, are not applicable to national banks. (12 CFR § 7.5002(c))

Our analysis of the banks' place of place of business for wage payment purposes does not stand as an obstacle to the banks' abilities to perform federally authorized activities through electronic means or facilities. Rather, our interpretation is compatible with the banks' ability to conduct such activities.

Carl Morris
Daniel P. Schwallie
July 7, 2008
Page 8

In the subject programs, the payroll service providers (American EPay and Hewitt Associates) have previously procured the specific financial institution where the payroll card account is to held and the providers administer the payroll card programs. The providers effectively act as *agents* of the client employers in discharging the employer's wage payment obligations. The control and oversight of the wage distribution by providers who act as agents of the participating employers thus raise other issues under existing laws. Thus, despite the voluntariness of an employee's participation in the pay card program and his or her authorization for *direct deposit* of wages, the issue of employee *access to* the payroll card account, and specifically any fee imposed for such access, must be further examined due to the relationship of the deposited funds being held by a bank by arrangement with employer's agent.

California has a long history of ensuring the protection of wages for California workers. Specifically, in addition to the conditions for use of wage payments by instruments in Labor Code § 212(a), it is unlawful for an employer or their agent to collect or receive from an employee any part of wages paid (Labor Code §§ 221, 2860), to secretly pay a lower wage while purporting to pay the wage designated by statute or contract (Labor Code § 223), withholding or diverting portions of wages (Labor Code § 224), falsely denying the amount of validity of wages with intent to secure for the employer or any other person any discount of wages (Labor Code § 216(b)). Also, the California Supreme Court has recognized that "it is manifest that wages due belong to the employee, and not to the employer...,"; that California courts "have recognized the policy favoring full and prompt payment of wages (*Id.*); and that " wages are not ordinary debts and "because of the economic position of the average worker and, in particular, his dependence on wages for the necessities of life for himself and his family, it is essential to the public welfare that he receive his pay when it is due. (*Kerr's Catering Service v. Dept. of Industrial Relations* (1962) 57 Cal.2d 319, 326)

Also, although Labor Code § 213 prohibits any of the provisions of Labor Code § 212 from being read *to prohibit* wage payment by direct deposit, the conditions in Labor Code § 212(a) which do not relate the direct deposit (which is the authorized substitute for the use of an "instrument" for payment) can be appropriately applied to the payroll card aspect of the program which is the vehicle for receipt of wages. Thus, the requirement that wages be "payable in cash without discount" would be applicable to the use of the payroll cards.

The above statutory provisions manifest a strong public policy that prohibits an employer (or its agent) from imposing conditions or obstacles which interfere with or prevent an employee's from promptly receiving their due wages *in full*. The imposition of a fee in order to readily *access* one's earned and paid wages under a payroll card program which is designed to discharge the employer's wage payment obligations could impermissibly interfere with an employee's receipt of paid wages by creating a financial condition which would have the *effect* of reducing or discounting wages because such fee would be charged against the same account in which wages are deposited.

The payroll card programs reviewed here, however, are described as providing for at least *one transaction per pay period without fee*. By providing one free transaction, the payroll card

Carl Morris
Daniel P. Schwallie
July 7, 2008
Page 9

programs effectively provide for immediate and free access to an employee's wages in full. The fact that there are other options for employees to choose such as to withdraw a lesser amount does not render the use of a payroll card violative of the employee's right to full and prompt payment of wages. There is a prompt means for an employee to withdraw their full wages as cash on the established pay day by performing an electronic transaction using the pay card at any VISA member financial institution (and under American EPay, at any U.S. Post Office). The employee thus has access to his full wages on the scheduled pay day and thus, the payroll card programs as described to DLSE do not violate the above stated wage payment provisions.

Additionally, with respect to the use of the payroll card, the *other* applicable provisions of Labor Code § 212(a) (not related to the direct deposit provisions in Labor Code § 213(d) or the requirements for an instrument in § 212(a)) requiring that wages be payable at some established place of business in the state and there be at least 30 days of sufficient funds for payment (in the event wages are not immediately accessed by the employee) appear to be satisfied. Employees have full access to their wages in cash at any VISA-member financial institution in California (and nationwide) as well as at any program merchants and designated surcharge free ATMs. The funds deposited into the employee accounts are held for at least 30 days.

Labor Code § 212(a)(2) further prohibits the use of any "scrip, coupon, card, or other thing redeemable, in merchandise or purporting to be payable or redeemable otherwise than in money." Under the described program, the deposit by the employer into the employee's account is payable in cash up to the full amount of his or her wages. The fact that there are other options for employees to choose such as to withdraw a lesser amount or have certain amounts transferred to other accounts does not render the payroll card as redeemable for something otherwise than in money. There is a ready and immediate means for an employee to withdraw their full wages as cash on the established pay day. The employee has full control of his wages and has any freedom to use the card to satisfy other obligations as authorized under the program if he or she chooses to do so.

The payroll cards appear to provide a prompt and convenient method of wage payments to employees who have full access to wages on scheduled pay days. The effectiveness of the described wage payment programs, in practice, will of course require that employees are fully informed of the service and procedures and that it is represented as an alternative method for wage payment for which their participation is optional.

Lastly, while this response addresses use of the payroll card programs under the requirements of Labor Code §§ 212 and 213, it should be emphasized that the companion requirement for distribution of an itemized wage statement required under Labor Code § 226(a) must also be followed. We are informed that on the scheduled pay day, employees receive an itemized wage statement (pay stub) electronically. This agency has addressed this subject in a recent opinion letter (O.L. 2006.07.06) which provides our interpretation of electronic distribution of itemized wage statements under Labor Code § 226(a) and you are referred to that letter.

Carl Morris
Daniel P. Schwallie
July 7, 2008
Page 10

This opinion is based exclusively on the facts and circumstances described in your request and is given based upon your representations, express or implied, that you have provided a full and fair description of all facts and circumstances that would be pertinent to our consideration of the questions presented. Existence of any other factual or historical background not contained in your letter might require a conclusion different from the one expressed herein. You have represented that this opinion is not sought by a party to pending private litigation concerning the issues addressed herein. You have also represented that this opinion is not sought in connection with an investigation or litigation between a client or firm and the Division of Labor Standards Enforcement.

I hope that the above sufficiently responds to your request and I thank you for your interest in compliance with California wage and hour laws.

Very truly yours,

Robert R. Roginson
Chief Counsel

Cc:    Angela Bradstreet, Labor Commissioner

2008.07.07

# EXHIBIT C

STATE OF CALIFORNIA                                                    Arnold Schwarzenegger, *Governor*

**DEPARTMENT OF INDUSTRIAL RELATIONS**
**DIVISION OF LABOR STANDARDS ENFORCEMENT**
455 Golden Gate Avenue, 9th Floor
San Francisco, California 94102
(415) 703-4863
(415) 703-4806 fax



*ANGELA BRADSTREET, STATE LABOR COMMISSIONER*

**ROBERT R. ROGINSON**
Chief Counsel

July 7, 2008

Donald J. Mosher, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022

> *Re: Money Network Checks – Payment of Wages Under Labor Code §212*

Dear Mr. Mosher:

This letter is in response to your letter dated November 1, 2007, requesting an opinion from this office on the question whether the use of a "Money Network Check" for payment of wages to California workers complies with California law and, specifically, Labor Code § 212 which governs the means of payment for wages.

You described the check cashing procedure which is used as part of a program offered by Money Network, a subsidiary of First Data Corporation, which provides employers with payroll distribution services including payment of wages by check or debit paycard. Although you refer generally to a "debit paycard" alternative as it relates to Money Network Services provided by your client, your request addresses and provides information regarding the "Money Network Check" and this letter limits its analysis to the specific question presented in your letter.

In essence, your letter and subsequent conversations with our office indicate the following facts relating to the wage disbursements using Money Network Checks.[1]  Pursuant to an irrevocable trust agreement, employers (clients of Money Network) deposit employee payroll into a pooled account established for the benefit of employees at MetaBank, a federal savings association and FDIC member.  The trust agreement is between the employer and First Data Trust Company, LLC, as trustee, and the employees as beneficiaries.  Employees are provided a supply of un-denominated Money Network Checks issued by MetaBank which can be replenished at any time if lost or stolen.  On payday, an employee calls the Money Network service at a toll free number to obtain authorization information (issuer and transaction numbers).  The number is then written in spaces provided on the face of the check and the check is not valid without such authorization information.  To obtain his or her pay as cash, the employee makes himself or herself the payee.

---

[1] You indicated that Money Network Checks was formerly called TransChecks which have been around for over 15 years with over 3.5 million cashed annually.

Donald J. Mosher, Esq.
July 7, 2008
Page 2

The Money Network Check can be cashed (one check free of fee per payroll period) at the "ACE Cash Express" address in California designated on the face of the check, or at any other ACE or Wal-Mart location in California which is also stated on the check. Money Network currently has formal arrangements with these businesses to provide check cashing service for Money Network checks without a fee for at least one transaction per pay period. Money Network can augment or replace the check cashing locations or network of locations and will have formal arrangements with new locations/networks to ensure that Money Network Checks continue to be cashed without a fee for employees at least once per pay period.[2]  You also clarified that an employee is *not required* to use Money Network Checks (or the companion debit card) and any employee may elect to receive their payroll by direct deposit in an account at a bank or credit union of their choosing.

Your letter described the Money Network Service as also providing convenience and protection of payroll funds. The current locations for cashing the checks without fee consists of approximately 140 current ACE and 170 Wal-Mart locations in California convenient to work, home, or shopping venues.  The procedure is described as secure since payroll funds are irrevocably deposited (the employer relinquishing all claims to the payroll funds) in the pooled account at MetaBank and the funds are FDIC insured and maintained for the benefit of employees. Once an employee completes the authorization process, the authorized funds are immediately transferred from the pooled account to a MetaBank clearing account maintained for the benefit of holders of the authorized checks and against which the checks are drawn.

California Labor Code §212 states, in relevant part:

> (a) No person, or agent or officer thereof, shall issue in payment of wages due, or to become due, or as an advance on wages to be earned:
>
> (1) Any order, check, draft, note, memorandum, or other acknowledgment of indebtedness, unless it is negotiable and payable in cash, on demand, without discount, at some established place of business in the state, the name and address of which must appear on the instrument, and at the time of its issuance and for a reasonable time thereafter, which must be at least 30 days, the maker or drawer has sufficient funds in, or credit, arrangement, or understanding with the drawee for its payment.

---

[2]  An employee can get their full wages with no encashment limit in one transaction without fee at any ACE location in California. Although your letter indicates that Wal-Mart has a $1,100 limit, you subsequently clarified that the limit has increased to $1,500 for a seven day period which is well below the average check of $376. You also indicated that Wal-Mart has, at its discretion, cashed checks over $1,500 demonstrated by the fact that less than 3% of checks cashed nationwide exceed $1,500, and approximately 1/3 of those checks are cashed at Wal-Mart. For the small percentage of employees who might have wages exceeding the limit at Wal-Mart, such employees can receive their full wages at any ACE location.

Donald J. Mosher, Esq.
July 7, 2008
Page 3

> (2) Any scrip, coupon, cards, or other thing redeemable, in merchandise or purporting to be payable or redeemable otherwise than in money.
>
> ...
>
> (c) Notwithstanding paragraph (1) of subdivision (a), if the drawee is a bank, the bank's address need not appear on the instrument and, in that case, the instrument shall be negotiable and payable in cash, on demand without discount, at any place of business of the drawee chosen by the person entitled to enforce the instrument.

A plain reading of Labor Code § 212(a) establishes a broad prohibition against payment of wages by (non-cash) methods using instruments *unless* such instrument complies with the conditions stated in subsection (a)(1), and further, is not "[a]ny scrip, coupon, cards, or other thing redeemable, in merchandise or purporting to be payable or redeemable otherwise than in money" as proscribed in subsection (a)(2). Additionally, Labor Code §213 states specific limitations on § 212 and provides, among other things, that § 212 does not prohibit an employer from performing a direct deposit of wages in an account at any bank, savings and loan association, or credit union. (Labor Code § 213(d))[3]

It is clear from the language in Labor Code § 213(d) that the Legislature specifically authorized wage payments using direct deposit and prescribed the conditions for such payment method. Section 213 cannot be reasonably interpreted, however, to constitute the *sole* method of payroll distribution which involves payment using bank deposits. Indeed, such interpretation would have the unintended effect of nullifying the general provisions in § 212. This division long-ago opined that employees who do not agree to direct deposit wage payment (thus failing to comply with § 213) must be paid in accordance with § 212. (O.L. 1987.01.07). The same reasoning would logically extend to a wage payment procedure which does not otherwise comply with the direct deposit provisions in § 213, i.e., the procedure must then comply with § 212. Thus, the fact that a specific wage payment procedure is authorized (i.e., not prohibited) under § 213, does not limit another type of wage payment procedure if it otherwise complies with § 212.

It is significant that the program does not mandate employee participation in the Money Network Service and that it is designed to provide an *alternative* for employees receiving their

---

[3] Labor Code §213 states:

Nothing contained in Section 212 shall:

...

(d) Prohibit an employer from depositing wages due or to become due or an advance on wages to be earned in an account in any bank, savings and loan association, or credit union of the employee's choice with a place of business in this state, provided that the employee has voluntarily authorized that deposit. If an employer discharges an employee or the employee quits, the employer may pay the wages earned and unpaid at the time the employee is discharged or quits by making a deposit authorized pursuant to this subdivision, provided that the employer complies with the provisions of this article relating to the payment of wages upon termination or quitting of employment.

Donald J. Mosher, Esq.
July 7, 2008
Page 4

wage payment.[4] Employees are also given the option of having their pay direct deposited into an account of their choosing at a bank, savings and loan association, or credit union of their choosing. Although a review of all the alternatives available to employees of your clients is beyond the scope of your inquiry, it deserves noting that any wage payment procedure, including direct deposit procedures, must comply with the applicable conditions set forth in Labor Code §§ 212 and 213 in order to be permissible under California law.

In the described check program, it is evident that the critical point for purposes of wage payment lies in the employees accessing their payroll funds on the scheduled pay day. The arrangements made between the employer and Money Network for deposit of the payroll funds into the pooled account at MetaBank are analogous to other arrangements made by employers with traditional payroll service providers who act as agents for the employer using banks for purposes of distributing payroll.[5] While the Labor Code does not purport to regulate the specific arrangements between employers and payroll service providers, both an employer and, under the express language in Labor Code § 212—their *agent*, must comply with its requirements.

Labor Code § 212(a)(1) first provides that "[a]ny order, check or draft, note, memorandum, or other acknowledgement of indebtedness…" may not be issued unless it is negotiable and payable in cash, on demand, without discount. Notably, the statute neither prescribes nor addresses the manner for making the payment instrument. The Money Network Check is an instrument made negotiable by the employee obtaining an authorization (issuer and transaction numbers) from Money Network's customer service for an amount up to the full wage amount due.[6] The funds previously deposited with the FDIC-insured bank are funds fully available and accessible to employees on the scheduled payday and the employer has no claims to any deposited payroll funds. The requirement of the program that the employee contact Money Network for authorization for the amount sought to be cashed protects both the employee and employer by ensuring that the proper wage amount is paid to the appropriate employee at the proper time for the applicable pay period.

The fact that the employee has a role in finalizing the instrument is no more burdensome than having to appear at a place to obtain one's paycheck or provide identification verification to an employer or payroll service in order to receive wages in person. As previously stated, the

---

[4] The optional nature of the Money Network Service is mandated under federal laws. Specifically, the Federal Reserve Board's Regulation E states: "*No financial institution or other person* may require a consumer to establish an account for receipt of electronic fund transfers with a particular institution as a condition of employment or receipt of governmental benefit." (12 CFR §205.10(e); italics added)

[5] Of course, this opinion does not render any determination or opinion regarding Money Network's compliance with federal or state banking laws or other applicable laws relating to financial institutions.

[6] Pursuant to the Uniform Commercial Code governing negotiable instruments adopted in California, a "check" includes "…a draft, other than a documentary draft, payable on demand and drawn on a bank…" (Comm. Code §3104(f)) Further, an instrument is a "draft" if it is an order to pay and a "note" if it is a promise. (Comm. Code §3104(e)) The sample draft of the Money Network Check contains the language "pay to the order of" and thus the instrument is a "check."

Donald J. Mosher, Esq.
July 7, 2008
Page 5

employee's participation in the program is voluntary so that employees who do not wish to have such role in obtaining the required authorization cannot be required to do so. Further, the employee's role does not (and cannot) diminish the obligation of the employer, through its agent, to effectively discharge its wage payment obligation. The agent must promptly provide the employee with authorization information necessary to render the check instrument negotiable and payable upon demand, without discount, at a place of business in the state.[7] Thus, the employer must bear any risks for any problems or delays resulting from the check cashing *procedure* if a violation is determined under particular circumstances.

It is also significant that there is no fee charged to the employee for one transaction per pay period which is consistent with the statutory language that such instrument be payable on demand and without discount. Since the check allows an employee to draw all of his or her wages with an instrument negotiable in cash, on demand and without discount for one transaction per pay period, the instrument effectively satisfies the first requirement stated in Labor Code § 212(a)(1).

Section 212(a)(1) further requires that the instrument be payable "at some established place of business in the state, the name and address of which must appear on the instrument…" This requirement applies even if the instrument is drawn on an out-of-state financial institution. (DLSE Enforcement Policies & Procedures Manual, §9.1.2) The face of the Money Network Check indicates that it may be cashed at ACE Cash Express at a specified address, and further, states "Or any ACE or Wal-Mart location." As previously stated, your letter indicates that there are approximately 140 current ACE and 170 Wal-Mart locations in California, and thus, employees are not limited to one pay-out location. In providing an established place of business in California where the check may be cashed on the face of the check, the instrument meets this statutory requirement even though the instrument is drawn on an out-of-state bank.

Labor Code § 212(a)(1) lastly states that "…at the time of its issuance and for a reasonable time thereafter, which must be at least 30 days, the maker or drawer has sufficient funds in, or credit, arrangement, or understanding with the drawee for its payment." Your letter states that funds are maintained in the pooled account at MetaBank for the benefit of employees pursuant to an irrevocable trust agreement where the employer relinquishes any right to deposited payroll funds. Three conditions are listed which describe distributions of payroll funds: (i) the payroll funds are reduced to zero by the employee, (ii) funds are disbursed to the employee by the trustee in accordance with the terms and conditions of the Money Network Service, and (iii) funds are distributed as otherwise required by applicable law (e.g., abandoned property requirements). Additionally, you stated that once an employee completes the authorization process for a check, the relevant amount of funds are immediately transferred from the pooled account to a bank-owned clearing account maintained for the benefit of the holder of the authorized check.

---

[7] An employer must continue to recognize that ultimate compliance responsibility for timely and prompt payment of wages to its employees lies with the employer under California wage payment laws notwithstanding arrangements made for payroll distribution using agents or other third parties. The importance of this obligation is underscored by Labor Code §219(a) which prevents the contravention in any way of any of the wage payment provisions, including §212, by any private agreement, whether written, oral, or implied.

Donald J. Mosher, Esq.
July 7, 2008
Page 6

Two of the three described conditions result from distribution of funds by or to the employee, and the third condition pertains to distributions required by law. There is no mention in the letter of the sufficiency of the funds for at least 30 days or the specific terms or conditions of the Money Network Service which results in disbursement of funds to the employee by the Trustee. You have since informed us, however, that payroll funds deposited are fully available and accessible for at least 30 days from the pay day for any of the above stated conditions. Given the irrevocable payment by the employer to the account established for the benefit of employees and the maintenance of sufficient funds to cover full payment of wages as well as the drawer's *arrangement or understanding* with the drawee (bank) for payment to employees up to the full amount of their wages due, the procedure satisfies the sufficiency of funds requirement in Labor Code § 212(a)(1).[8]

It is worth noting that the Money Network Check is drawn against funds in a bank. The bank is thus the drawee (the person or entity ordered in a draft to make payment).[9] As previously quoted above, Labor Code §212(c) specifies that notwithstanding §212(a)(1), if the drawee is a bank, "the bank's address need not appear on the instrument and in that case, the instrument shall be negotiable and payable in cash, on demand, without discount, at any place of business of the drawee chosen by the person entitled to enforce the instrument." Here, the bank's address is listed on the instrument.

Lastly, while this response addresses use of the Money Network Check under the requirements of Labor Code § 212, it should be emphasized that the companion requirement for distribution of an itemized wage statement required under Labor Code § 226(a) must also be followed. You informed us that the Money Network Service covers only distribution of funds and not information. On the scheduled pay day, employees receive an itemized wage statement (pay stub) from the employer as they would otherwise receive under direct deposit which normally involves a combination of paper with electronic option. Money Network offers an optional service, however, for employers where it distributes pay stubs electronically. This agency has addressed this subject in a recent opinion letter (O.L. 2006.07.06) which provides our interpretation of electronic distribution of itemized wage statements under Labor Code §226(a) and I refer you to that letter.

The Money Network Check appears to provide a prompt and convenient method of wage payments to employees who have full access to wages on scheduled pay days. The success of the

---

[8] Labor Code §212(a)(2) prohibits the use of any "scrip, coupon, card, or other thing redeemable, in merchandise or purporting to be payable or redeemable otherwise than in money." Under the described program, the check, once authorized, is a negotiable instrument payable in cash and is payable up to the full amount of his wages. The fact that there are other options for employees to choose such as to withdraw a lesser amount or have certain amounts transferred to other accounts does not render the instrument non-negotiable nor redeemable for something otherwise than in money. There is a ready and immediate means for an employee to withdraw their full wages as cash on the established pay day. The employee has full control of his wages and since the check is a negotiable instrument, the Money Network Check can be transferred or deposited to the same extent as any other payroll check to satisfy obligations of an employee if he or she chooses to do so.

[9] See Commercial Code §3103(a)(2).

Donald J. Mosher, Esq.
July 7, 2008
Page 7

described procedure, in practice, will of course require that employees are fully informed of the service and procedures and that it is presented as an *alternative* method for wage payment for which their participation is optional.

This opinion is based exclusively on the facts and circumstances described in your request and is given based upon your representations, express or implied, that you have provided a full and fair description of all facts and circumstances that would be pertinent to our consideration of the questions presented. Existence of any other factual or historical background not contained in your letter might require a conclusion different from the one expressed herein. You have represented that this opinion is not sought by a party to pending private litigation concerning the issues addressed herein. You have also represented that this opinion is not sought in connection with an investigation or litigation between a client or firm and the Division of Labor Standards Enforcement.

I hope that the above sufficiently responds to your request and I thank you for your interest in compliance with California wage and hour laws.

Very truly yours,

Robert R. Roginson
Chief Counsel


cc:    Angela Bradstreet, Labor Commissioner

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| RODRIGUEZ, | ) | CV-14-1508-BLF |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | JUNE 30, 2016 |
| | ) | |
| NIKE RETAIL SERVICES, INC., ET | ) | PAGES 1-41 |
| AL, | ) | |
| | ) | |
| DEFENDANT. | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

    FOR THE PLAINTIFF:  LARRY LEE
                        NICHOLAS ROSENTHAL
                        DENNIS HYUN
                        DIVERSITY LAW GROUP, P.C.
                        515 S. FIGUEROA ST., STE 1250
                        LOS ANGELES, CA 90071

    FOR THE DEFENDANT:  JOHN MEER
                        SEYFARTH SHAW, LLP
                        2029 CENTURY PARK EAST, STE 3500
                        LOS ANGELES, CA 90067



    OFFICIAL COURT REPORTER:  SUMMER FISHER, CSR, CRR
                              CERTIFICATE NUMBER 13185


            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                TRANSCRIPT PRODUCED WITH COMPUTER

```
1        SAN JOSE, CALIFORNIA              JUNE 30, 2016

2                      P R O C E E D I N G S

3        (WHEREUPON, COURT CONVENED AND THE FOLLOWING PROCEEDINGS

4    WERE HELD:)

5             THE CLERK:  CALLING CASE 14-1508.  RODRIGUEZ VERSUS

6    NIKE RETAIL SERVICES.

7        COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES.

8             MR. LEE:  GOOD MORNING, YOUR HONOR.

9    LARRY LEE FOR PLAINTIFF.

10            THE COURT:  GOOD MORNING.

11            MR. ROSENTHAL:  GOOD MORNING, YOUR HONOR.

12   NICK ROSENTHAL FOR PLAINTIFF.

13            MR. HYUN:  GOOD MORNING, YOUR HONOR.

14   DENNIS HYUN ON BEHALF OF PLAINTIFF.

15            MR. MEER:  GOOD MORNING.

16   JOHN JON MEER, SEYFARTH SHAW, FOR DEFENDANT.

17            THE COURT:  GOOD MORNING.

18       OKAY.  WELL, I HAVE CROSS MOTIONS.  I DON'T KNOW WHY THAT

19   HAPPENED.  I KNOW IT'S ALLOWED.  I DON'T ENCOURAGE IT.  IT WAS

20   USELESS BRIEFING, IN MY VIEW, A WASTE OF PAPER TO SAY THE SAME

21   THING TWICE, BUT YOU'VE DONE THAT.

22       AND MR. LEE, BEFORE WE GET STARTED, LET ME TELL YOU THAT IF

23   YOU EVER AGAIN FILE A BRIEF WITH NO MARGINS AND 31 LINES TO A

24   PAGE AND LESS THAN 12 POINT TYPE, I WILL STRIKE IT.

25            AND I HAD DRAFTED THE ORDER TO STRIKE IT TWO DAYS AGO WHEN
```

1    I READ IT, AND DECIDED THAT BECAUSE OF MY OWN DELAY IN READING

2    YOUR PAPERS, THAT THAT WAS NOT SUFFICIENT TIME TO ALLOW YOU TO

3    REWRITE THE BRIEF.  WE HAVE PAGE LIMITS AND WE HAVE

4    REQUIREMENTS ON BRIEFING, AND I WILL NOT ACCEPT IT AGAIN.  IS

5    THAT UNDERSTOOD?

6            MR. LEE:  I UNDERSTAND.  I APOLOGIZE.

7            THE COURT:  YOU DIDN'T HAVE TIME TO WRITE A SHORT

8    BRIEF, SO YOU GAVE ME THE LONG ONE.  IT'S NOT ACCEPTABLE.

9        OKAY.  I AM GOING TO HEAR THE MOTION TO CERTIFY THE CLASS

10   FIRST.  IT'S MY EXPECTATION THAT -- AND I WILL JUST TELL YOU MY

11   TENTATIVE VIEW OF THE PAPERS IS THAT I WOULD CERTIFY THE CLASS

12   IN THIS CASE.  SO I WANT YOU TO KNOW THAT.  I AM CERTAINLY

13   INTERESTED IN HEARING THE ARGUMENTS.

14       AND MR. MEER, I'M PARTICULARLY COGNIZANT ON POLICY OF WAIT

15   TIME, BUT I DID FIND THAT THE RESPONSE OR THE REPLY ON THE

16   AFFIRMATIVE MOTION BY THE PLAINTIFFS ON THE EVIDENCE, ON THE

17   WAIT TIME APPLICATION, WAS SUCH THAT I DON'T THINK IT'S AS

18   CLEAR A POINT AS YOU SUGGESTED, AND IN FACT UNLESS YOU TELL ME

19   OTHERWISE, IT DOESN'T APPEAR THAT YOU HAVE ANY EVIDENCE THAT

20   THE WAIT TIME POLICY WAS EVER APPLIED TO THE SECURITY AND BAG

21   CHECK CIRCUMSTANCE.

22       AND I BELIEVE -- AND IN ADDITION, IN ITS BEST LIGHT, YOU

23   SUGGEST 571 CIRCUMSTANCES WHERE EMPLOYEES WERE COMPENSATED FOR

24   OFF-THE-CLOCK TIME UNDER THE POLICY WHICH THE PLAINTIFFS

25   PROVIDE TO ME SOME INDICATION THAT THAT IS LESS THAN 1/100TH OF

1    A PERCENT.  AND SO 99.9 PERCENT OF THE TIME THERE'S NO

2    COMPENSATION, WHICH IS PRETTY GOOD FOR THEIR POINT.

3         AND NONE OF THE COMMENTS IN THE 131 COMMENTS THAT YOU

4    IDENTIFIED WOULD CONFIRM THAT THE MANAGERS ARE APPLYING THE

5    WAIT TIME RELIEF IN THE WRITTEN POLICY TOP THESE BAG CHECKS.

6         THE OTHER THING THAT I WANTED TO COMMENT ON IS THAT I

7    CERTAINLY APPRECIATE AND AM AWARE OF JUDGE ALSUP'S RULING ON

8    SUMMARY JUDGEMENT IN THE APPLE CASE, AND I KNOW THAT'S ON

9    APPEAL.

10        I KNOW IT WAS JUST REPORTED THAT THE BRIEFING WAS -- THAT

11   THE BRIEFING IS JUST ABOUT COMPLETE IN THAT CASE, BUT I'M NOT

12   AT SUMMARY JUDGEMENT AND I'M ACTUALLY NOT PREPARED TO MAKE THE

13   KIND OF MERITS RULING ON DE MINIMUS, YOUR ARGUMENT OF

14   DE MINIMUS EFFECT AT THIS STAGE.

15        I APPRECIATE THAT, I THINK THAT I CERTAINLY HAVE A CERTAIN

16   OBLIGATION TO LOOK AT THE MERITS OF THE CASE, BUT I'VE

17   CONSIDERED THAT MORE IN LIGHT OF INFORMING ME ABOUT THE COMMON

18   QUESTIONS, COMMON PROOF ISSUES THAT I WOULD BE LOOKING AT.

19        SO I THINK THAT SORT OF STATES SOME OF THE THINGS THAT I

20   WAS CONCERNED ABOUT.

21        I'M GOING TO START WITH PLAINTIFFS.  I'M STARTING WITH

22   THEIR MOTION, MR. LEE, OR I'M NOT SURE WHO IS GOING TO ARGUE

23   IT.

24             MR. ROSENTHAL:  MR. ROSENTHAL.

25             THE COURT:  OKAY.  MR. ROSENTHAL, THANK YOU.

1          MR. ROSENTHAL:  YEAH, I MEAN, JUST AS AN INITIAL

2     POINT YOUR HONOR, THERE'S NO DISPUTE BETWEEN THE PARTIES WHAT

3     THE POLICY WAS HERE IN TERMS OF SECURITY CHECKS.

4          EVERY EMPLOYEE WOULD CLOCK OUT OF THE BACK OF THE STORE,

5     WALK TO THE FRONT, REGARDLESS OF WHETHER THEY HAD A BAG OR NOT,

6     HAD TO WAIT FOR A MANAGER TO COME, IF THEY HAD A BAG IT WOULD

7     BE SEARCHED, IF THEY DIDN'T HAVE A BAG THEY WOULD UNDER GO A

8     VISUAL INSPECTION.  AND THEN THEY WERE PERMITTED TO LEAVE.

9          THE COURT:  THAT'S DIFFERENT THAN THE APPLE CASE

10    RIGHT THERE.

11         MR. ROSENTHAL:  EXACTLY, YOUR HONOR, IN APPLE ONLY

12    EMPLOYEES WHO HAD BAGS ARE SUBJECT TO THE SEARCH.

13         YOUR HONOR IS EXACTLY RIGHT IN THE FACT THAT EVER SECURITY

14    CHECK, SECURITY CHECK CASE WHERE EVERY PUTATIVE CLASS MEMBER

15    WAS SUBJECT TO A SEARCH REGARDLESS IF THEY HAD A BAG OR NOT,

16    THE CLASS GETS CERTIFIED.

17         WE SEE THIS IN SCOTT-GEORGE V. PVH, CERVANTEZ V. CELESTICA,

18    MOORE V. ULTA, OTSUKA V. POLO, AND THIS CASE FALLS DIRECTLY

19    WITHIN THE GAMBIT OF THOSE CASES.

20         THE COURT:  SO THOSE CASES DON'T HAVE THIS WAIT TIME.

21    I MEAN, IT IS INTERESTING, AND I DON'T KNOW WHAT WAIT TIME

22    MEANS, BUT MORE IMPORTANTLY, IT DOESN'T APPEAR THAT THE

23    DEFENDANT'S MANAGERS KNOW WHAT WAIT TIME MEANS.

24         I THINK THAT GETS TO THE MERITS.  I'M RELUCTANT TO FOCUS ON

25    IT VERY MUCH EXCEPT TO THE EXTENT THAT THE EVIDENCE, AS I SAID,

1    THE EVIDENCE THAT THE DEFENSE SUBMITS ON ITS, THE APPLICATION

2    OF THE WAIT TIME EXCEPTION TO EMPLOYEES IS SPARSE

3              MR. ROSENTHAL:  YOU ARE CORRECT, YOUR HONOR.

4       I MEAN, AS YOUR HONOR POINTED OUT, 571 INSTANCES MAX OUT

5    OF, WE ESTIMATE 2.5 MILLION SECURITY CHECKS, DOESN'T RISE TO

6    THE LEVEL WHERE IT WOULD PREVENT CLASS CERTIFICATION.

7              THE COURT:  NOW YOU ARE NOT OBJECTING TO THE FACT

8    THAT THE TIME CLOCK IS SOME DISTANCE FROM THE EXIT OF THE

9    STORE.

10             MR. ROSENTHAL:  NO, YOUR HONOR.

11             THE COURT:  OKAY.  SO FOR ANY EMPLOYEE, THEY PUNCH

12   THEIR TIME CARD UPSTAIRS AND IT TAKES SOME NUMBER OF SECONDS OR

13   MINUTES, I DON'T KNOW, EACH STORE IS DIFFERENT OBVIOUSLY, TO

14   GET TO THE FRONT DOOR.

15      SO ABSENT A BAG CHECK OR SECURITY CHECK, THAT -- WE WILL

16   CALL IT TWO MINUTES TO GET OUT, IS NOT A CONCERN TO YOU.

17             MR. ROSENTHAL:  NO.

18      WE ARE SIMPLY CONCERNED WITH THE AMOUNT OF TIME THE

19   EMPLOYEES SPEND WAITING FOR A SECURITY CHECK AND UNDERGOING THE

20   SECURITY CHECK.

21             THE COURT:  ALL RIGHT.  AND THAT'S WHAT I HAD

22   UNDERSTOOD.

23      I JUST WANT TO BE CLEAR BECAUSE ALTHOUGH YOU SUGGEST THAT

24   THE TIME CLOCK COULD BE AT THE FRONT DOOR, I THINK THAT'S --

25   AND WE WILL GET TO THAT, THAT'S ACTUALLY -- IN MY MIND'S EYE,

1    THAT'S PRETTY UNREALISTIC TO HAVE EMPLOYEE PERSONNEL MATERIALS

2    BY THE FRONT DOOR WHERE THE PUBLIC IS COMING AND GOING.  BUT I

3    THINK I'M NOT THERE, I DON'T NEED TO WORRY ABOUT THAT.

4            MR. ROSENTHAL:  WE RAISE THAT ARGUMENT IN RESPONSE TO

5    THE DE MINIMUS ARGUMENT WHICH THIS COURT ISN'T CONCERNED WITH.

6            THE COURT:  I THINK IT'S A MAJOR ISSUE AND I THINK

7    THAT WHETHER JUDGE ALSUP IS AFFIRMED OR NOT, I THINK THE

8    ANALYSIS IS GOING TO BE VERY IMPORTANT AT SUMMARY JUDGEMENT,

9    AND IF NOT THERE, THEN AT TRIAL.

10           MR. ROSENTHAL:  I SIMPLY MEANT AT THE TIME OF THIS

11   MOTION.

12           THE COURT:  I DON'T WANT THE RECORD TO REFLECT THAT

13   I'M NOT CONCERNED WITH IT, I THINK JUST NOT NOW.

14           MR. ROSENTHAL:  I DIDN'T MEAN TO IMPLY THAT.

15           THE COURT:  OKAY.

16           MR. ROSENTHAL:  SO DEFENDANT ALSO RAISES THE ISSUE OF

17   PERHAPS THE EMPLOYEES ARE NOT UNDER THE CONTROL OF NIKE WHILE

18   BEING SUBJECTED TO THE SECURITY CHECKS.  IT IS FUNDAMENTAL TO

19   CONTROL THAT THEY WERE NOT ABLE TO LEAVE THE STORE.

20       SO, AND I CAN EXPAND ON THAT POINT IF YOU WANT, YOUR HONOR.

21           THE COURT:  I THINK IT'S IMPLAUSIBLE TO THINK THAT

22   SOMEONE IS NOT UNDER THE CONTROL OF THEIR EMPLOYER WHEN THEIR

23   PERSONAL PROPERTY OR THEIR BODY IS BEING INSPECTED.

24           MR. ROSENTHAL:  AND I THINK THE FINAL ARGUMENT THE

25   DEFENDANT RAISES IS THAT THERE'S A CONFLICT IN THE CLASS

1     BECAUSE SOME OF THE PUTATIVE CLASS MEMBERS ACTUALLY PERFORMED

2     THE SECURITY CHECKS ON OTHER PUTATIVE CLASS MEMBERS.

3          THIS IS NOT A POLICY THAT WAS BEING DEVELOPED BY INDIVIDUAL

4     MANAGERS, THIS IS A TOP-DOWN POLICY THAT WAS NIKE'S OFFICIAL

5     POLICY FOR ALL RETAIL EMPLOYEES IN THE STATE OF CALIFORNIA.

6          AND SO AT MOST, PUTATIVE CLASS MEMBERS WERE SIMPLY

7     ADMINISTERING IT BUT HAD NO DISCRETION.

8               THE COURT:  SO THE MANAGERS ARE NONEXEMPT.

9               MR. ROSENTHAL:  SOME ARE, SOME ARE NOT, IS MY

10    UNDERSTANDING.

11              THE COURT:  OKAY.  BECAUSE OF COURSE IT RAISES, I

12    DON'T KNOW HOW -- IN THE PAPERS THERE WAS A DESCRIPTION OF THE

13    JOB TITLES.  SO WE HAVE A DIVIDE BETWEEN WHO IS AUTHORIZED TO

14    PERFORM THE SECURITY CHECK AND WHO IS NOT AUTHORIZED.  BUT EVEN

15    THOSE WHO PERFORM IT ARE SUBJECT TO IT.

16              MR. ROSENTHAL:  SOME OF THEM ARE.

17         AND MR. MEER MAY CORRECT ME ON THIS, MY UNDERSTANDING IS

18    THAT STORE MANAGERS OR THE HEAD COACHES ARE GENERALLY EXEMPT,

19    WHEREAS SOME OF THE LOWER LEVEL MANAGERIAL STAFF IS NONEXEMPT.

20              THE COURT:  OKAY.  SO THERE ARE TWO THINGS I'M

21    LOOKING AT.

22         WHEN YOU USE THE WORD "EXEMPT," ARE YOU TALKING ABOUT

23    EXEMPT FROM WAGE-AN-HOUR LAWS OR FROM SECURITY CHECKS?

24              MR. ROSENTHAL:  FROM WAGE-AN-HOUR LAWS.  MY

25    UNDERSTANDING IS EVERYONE HAS TO UNDER GO THE SECURITY CHECKS.

```
 1              THE COURT:  THAT'S WHAT I WAS GETTING AT.  THAT'S

 2    WHAT I THOUGHT.

 3         SO EVERY EMPLOYEE, REGARDLESS OF THEIR STATUS, HAS TO GO

 4    THROUGH THIS SECURITY CHECK.  AND SOME OF THEM WOULD NOT BE

 5    ENTITLED TO PAY FOR IT BECAUSE THEY ARE NOT HOURLY.

 6              MR. ROSENTHAL:  CORRECT, YOUR HONOR.

 7              THE COURT:  ALL RIGHT.

 8         AND YOU ARE NOT -- YOU DIDN'T SUGGEST SIMPLY NARROWING THE

 9    CLASS TO EXCLUDE THOSE WHO ARE AUTHORIZED TO PERFORM THE

10    SECURITY CHECK.

11              MR. ROSENTHAL:  NO, NO.

12         THE CLASS, THE PUTATIVE CLASS IS ALL NONEXEMPT EMPLOYEES.

13    REGARDLESS OF WHETHER THEY WERE ABLE TO PERFORM SECURITY CHECKS

14    OR NOT.

15              THE COURT:  OKAY.  ALL RIGHT.

16         ANYTHING ELSE THAT YOU WANTED TO ADDRESS BEFORE I HEAR FROM

17    MR. MEER?

18              MR. ROSENTHAL:  NOT AT THIS TIME, YOUR HONOR.

19              THE COURT:  OKAY.  THANK YOU.

20         MR. MEER, I KNOW YOU HAVE A LITTLE BIT OF A JOB TO DO HERE

21    TO PERSUADE ME OTHERWISE, I JUST WANTED YOU TO KNOW MY THINKING

22    BEFORE YOU GOT STARTED.

23              MR. MEER:  I APPRECIATE THAT, YOUR HONOR.  SO I WILL

24    TRY TO ADDRESS THE POINTS IN THE ORDER THAT THE COURT RAISED

25    THEM.
```

```
1              THE COURT:  THEY ARE IN NO PARTICULAR ORDER.

2              MR. MEER:  THERE ARE CASES THAT HAVE CERTIFIED BAG

3    CHECK CLASSES, THERE ARE CASES THAT DO NOT HAVE CERTIFIED BAG

4    CHECK CLASSES.

5              ALL OF THE CASES WHERE THEY HAVE CERTIFIED BAG CHECK

6    CLASSES HAVE HAD A UNIVERSAL ROLE THAT THE BAG CHECKS WERE NOT

7    COMPENSABLE.

8              NOT ONE PERCENT PAID OR TWO PERCENT PAID OR 50 PERCENT

9    PAID, BUT NOBODY WAS PAID FOR THE BAG CHECKS.  AND ALL THE

10   CASES THAT PLAINTIFF CITE INVOLVE THOSE CIRCUMSTANCES.

11             AND SO IN THIS CASE, WE ARE DIFFERENT IN THAT WE HAVE A

12   POLICY THAT PROVIDES FOR PAYMENT IF SOMEBODY WAITS FOR BAG

13   CHECKS.

14             AND THE COURT HAD INDICATED, WELL, THE MANAGERS DON'T KNOW

15   THAT THAT POLICY EXISTS, BUT WE HAVE DECLARATION TESTIMONY AND

16   PLAINTIFFS HAVE CROSS-EXAMINED THESE MANAGERS IN DEPOSITION

17   STATING THAT THEY DO ADJUST TIME FOR BAG CHECKS.

18             WE'VE GOT DECLARATIONS FROM SEVEN MANAGERS BEGINNING AT

19   PAGES 3 AND 4 OF OUR OPPOSITION TO THE MOTION FOR CLASS

20   CERTIFICATION WHERE THEY SAY ON SEVERAL OCCASIONS, I HAVE

21   ADJUSTED TIME FOR EMPLOYEES WAITING FOR A MANAGER TO ARRIVE FOR

22   A BAG CHECK, THAT'S THE DAQUINA DECLARATION.

23             THE ETHERINTON DECLARATION SAYS, IF AN EMPLOYEE REPORTS

24   THEY HAD TO WAIT FOR A BAG CHECK, THAT I ADJUST THE TIME.

25             THE GREER DECLARATION REPORTS THAT I ADJUST TIME FOR
```

1    EMPLOYEES WHO ARE WAITING FOR A BAG CHECK CONSISTENT WITH

2    COMPANY POLICIES.

3            THE COURT:  ISN'T THERE SOME CONCERN THAT IF THE

4    POLICY PUTS THE ONUS ON THE EMPLOYEE TO REQUEST THE

5    COMPENSATION, THAT THAT'S NOT APPROPRIATE?

6            MR. MEER:  THE POLICY DOES NOT PUT THE ONUS ON THE

7    EMPLOYEE AS THE 30(B)(6) DEPONENT SAID, IT'S A RESPONSIBILITY

8    OF THE MANAGER AND THE EMPLOYEE.  BECAUSE AN EMPLOYER IS ONLY

9    LIABLE IF IT KNOWS OR SHOULD HAVE KNOWN IF AN EMPLOYEE IS

10   WORKING, THERE HAS TO BE SOME ONUS ON THE EMPLOYEE.

11           THE COURT:  I CERTAINLY AGREE WITH THE STATEMENT YOU

12   MADE.

13       BY ITS VERY NATURE, BECAUSE A MANAGER HAS TO PERFORM THE

14   SECURITY CHECK, DOESN'T -- ISN'T THE EMPLOYER ON NOTICE IN

15   EVERY INSTANCE?

16           MR. LEE:  NOT FOR THE WAITING TIME, YOUR HONOR.  SO

17   FOR INSTANCE --

18           THE COURT:  WHY IS THAT?

19           MR. MEER:  IF I SEE AN EMPLOYEE STANDING BY THE

20   DOORWAY TALKING ON HIS CELL PHONE, I DON'T KNOW IF THE EMPLOYEE

21   IS MAKING PLANS FOR AFTER WORK OR WAITING FOR A MANAGER.

22       I DON'T KNOW IF THE EMPLOYEE HAS SAID, I'M NOT READY TO

23   LEAVE THE STORE YET BECAUSE MY BUS DOESN'T COME FOR 15 MINUTES,

24   SO I'M STANDING HERE BY THE DOOR BECAUSE IT'S RAINING.

25           AND SO THE MANAGER MIGHT NOT KNOW IF EMPLOYEES ARE READY TO

1    LEAVE.

2           THE COURT:  I'M NOT TALKING ABOUT THE INDIVIDUAL

3    MANAGER TO PERFORM THE SECURITY CHECK, NOT THE STORE MANAGER.

4    YOU ARE RIGHT, THE STORE MANAGER COULD BE SOMEWHERE ELSE.

5    THOSE EXAMPLES YOU GIVE ARE REASONABLE.

6         BUT I'M TALKING ABOUT THE ACTUAL MANAGER WHO PERFORMS THE

7    SECURITY CHECK WHO COULD BE A LOWER LEVEL SUPERVISORY EMPLOYEE

8           MR. MEER:  YES.

9         TO CLARIFY THAT POINT, SO THERE ARE TWO LEVELS OF MANAGERS

10   WHO ARE EXEMPT OR SALARIED AT THE STORE.  THEY ARE CALLED A

11   HEAD COACH AND ASSISTANT HEAD COACH.  AND THEN THERE ARE

12   SUPERVISORS AND LEADS AND DEPARTMENT HEADS THAT ARE NONEXEMPT.

13         ANY OF THOSE FOLKS CAN CONDUCT A BAG CHECK.  SO SOME OF THE

14   POTENTIAL CLASS MEMBERS WOULD BE CONDUCTING BACK CHECKS FOR

15   OTHERS.

16         BUT ON THE ISSUE OF THE EMPLOYEE HAVING TO INFORM, WE'VE

17   GOT TESTIMONY THAT THE MANAGERS RECOGNIZING THIS THEMSELVES AND

18   ADJUST TIME.

19           THE COURT:  SOME DO.

20           MR. MEER:  SOME DO, BUT THAT'S WHERE CLASS

21   CERTIFICATION BECOMES DIFFICULT.

22         AND THE POLICY, YOUR HONOR, SAYS THAT THE MANAGERS ARE

23   SUPPOSED TO DO THIS ON THEIR OWN BECAUSE WAITING TIME IS

24   SUPPOSED TO BE COMPENSABLE TIME.

25           THE COURT:  SO THAT REMINDS ME, AND I'M SORRY YOU

1    COULDN'T FIND IT, YOU REFER TO THE WAIT TIME POLICY AS BEING AN

2    EXHIBIT TO THE PIKE DEPOSITION.  I DIDN'T ACTUALLY SEE THE

3    MCPIKE DEPOSITION AND I DON'T KNOW IF I HAVE THAT EXHIBIT.  I

4    DON'T HAVE ECF REFERENCE OR EXHIBIT NUMBER.

5         AND I'M SORRY TO PUT YOU ON THE SPOT, BUT I ACTUALLY WANTED

6    TO SEE THE POLICY ITSELF RATHER THAN YOUR QUOTATION OF IT IN

7    THE BRIEF.

8         I'M SURE YOU QUOTED IT RIGHT, I WOULD JUST LIKE TO SEE THE

9    WHOLE THING.  YOUR QUOTATION WAS MCPIKE EXHIBIT 110.  WHERE DO

10   I HAVE THAT?

11            MR. MEER:  IT WOULD HAVE BEEN ATTACHED TO MY

12   DECLARATION WHERE WE ATTACHED THE CITED DEPOSITION TESTIMONY

13   AND THE EXHIBITS.  IT WAS PROBABLY ATTACHED TO MY DECLARATION

14   AND ALSO MR. ROSENTHAL'S DECLARATION.

15        AND I TAKE TO HEART THE COURT'S COMMENT THAT THERE WERE

16   MULTIPLE BRIEFS, SO IT WAS PROBABLY ATTACHED MULTIPLE TIMES.

17            THE COURT:  MULTIPLE TIMES IS FINE, BUT SENDING ME

18   BACK WAS CHALLENGING.

19        I'M SORRY TO PUT YOU ON THE SPOT, BUT I ACTUALLY LOOKED FOR

20   IT AND COULDN'T FIND IT, SO I WILL HAVE TO LOOK -- BECAUSE YOUR

21   EXHIBITS WERE ACTUALLY FAIRLY MODEST IN OPPOSITION IN TERMS OF

22   VOLUME.

23            MR. MEER:  YES.

24            THE COURT:  AND I DIDN'T SEE THE MCPIKE --

25            MR. MEER:  I BELIEVE IT PROBABLY WOULD HAVE BEEN

1      ATTACHED FOR THE FIRST TIME IN OUR MOVING PAPERS TO DENY CLASS

2      CERTIFICATION.

3              THE COURT:  OKAY.

4              MR. MEER:  AND THAT WOULD HAVE BEEN ATTACHED TO MY

5      DECLARATION IN CONNECTION WITH THE MOVING PAPERS.

6              THE COURT:  THAT GIVES ME A WAY TO LOOK FOR IT.  I

7      DIDN'T MEAN TO TAKE UP TIME NOW.  I DIDN'T MEAN TO DO THAT, BUT

8      I WAS INTERESTED IN SEEING IT.  I WILL GO BACK AND LOOK IN YOUR

9      MOVING PAPERS.

10             MR. MEER:  SO WE HAVE A POLICY THAT PROVIDES FOR

11     WAITING TIME, UNLIKE ANY OF THE OTHER CASES WHERE CLASS WAS

12     CERTIFIED AND WE HAVE SEVEN MANAGERS WHO HAVE SAID THAT I HAVE

13     IN FACT ON NUMEROUS OCCASIONS ADJUSTED TIME FOR WAITING TIME.

14     AND IN FACT OF THOSE 571 OCCASIONS, ABOUT 48 OF THEM ARE

15     ADJUSTMENTS FOR ONE MINUTE.

16          THE NIKE TIME CLOCK DOESN'T ALLOW ADJUSTMENTS FOR SMALLER

17     INCREMENTS, AND NO LAW REQUIRES AN EMPLOYER TO PAY IN SECONDS.

18             THE COURT:  NO.

19             MR. MEER:  AND SO WE HAVE ON NUMEROUS ADJUSTMENTS

20     THAT SHOW THAT EVEN IF SOMEBODY IS WAITING LESS THAN A MINUTE,

21     WILL HAVE THEIR TIME ADJUSTED.

22             THE COURT:  YOU ACTUALLY WOULD WANT ME TO INFER FROM

23     THAT EVIDENCE THAT THE POLICY DOES ITS JOB, AND IN FACT IT'S

24     ONLY IN THE MINUTEST OF CIRCUMSTANCES THAT EMPLOYEES WAIT FOR

25     MORE THAN A MINUTE.

1          MR. MEER:  YES.

2          THE COURT:  I CAN'T DRAW THAT CONCLUSION THOUGH.

3          MR. MEER:  WE CAN FROM THE EVIDENCE IN THE RECORD,

4    YOUR HONOR.  BECAUSE WE'VE GOT NUMEROUS DECLARATIONS THAT SAY

5    THAT THERE HAS TO BE A MANAGEMENT LEVEL EMPLOYEE STATIONED AT

6    THE EXIT BECAUSE CUSTOMERS ARE SUBJECT TO INSPECTIONS AS WELL.

7          THE COURT:  I UNDERSTAND.

8          MR. MEER:  AND SO THERE ISN'T A POINT WHERE SOMEBODY

9    IS NOT STATIONED AT AN EXIT, AND THERE ISN'T A POINT WHERE

10   SOMEBODY WOULD HAVE TO WAIT FOR A MANAGER ABSENT EXTRAORDINARY

11   CIRCUMSTANCES.

12      AND I WILL CONCEDE THAT IN ONE PERCENT OF THE TIME THERE

13   MIGHT BE AN EXTRAORDINARY CIRCUMSTANCE WHERE THERE'S AN EYE

14   RATE CUSTOMER WHO IS HOLDING UP A MANAGER AND THE MANAGER ISN'T

15   ABLE TO ATTEND TO THE BAG CHECK.  BUT THE BAG CHECKS ARE

16   CONDUCTED IN THE BAG CHECK PROCESS ITSELF, NOBODY DISPUTES THAT

17   THAT'S A TWO SECOND OR MAYBE LESS PROCEDURE.

18         THE COURT:  ONCE THERE'S SOMEONE ON THE SCENE AND

19   IT'S MY TURN TO GO THROUGH, IT'S A REALLY QUICK PROCESS.

20         MR. MEER:  YES.

21         THE COURT:  SO THAT'S UNDERSTOOD AND I THINK THIS

22   CASE IS REALLY ABOUT THE TIME IT TAKES TO GET TO BE MY TURN.

23         MR. MEER:  AND THE TIME IT GETS TO BE MY TURN WE'VE

24   GOT OVER 30 DECLARANTS WHO SAY I NEVER HAVE TO WAIT FOR IT TO

25   BE MY TURN.  IN FACT, WE'VE GOT THREE TIMES AS MANY WITNESSES

1    AS PLAINTIFF HAS TO SAY IT'S NEVER A WAIT FOR IT TO BE MY TURN.

2           THE COURT:  MY CONCERN HERE IS DRAWING THE LINE

3    BETWEEN THE MERITS DETERMINATION AND, YOU KNOW, I CAN SEE QUITE

4    POSSIBLY THIS CASE HAVING A SIMILAR CONCLUSION AS THE APPLE

5    CASE HAD, IS THAT THE CLASS GETS CERTIFIED, BUT AT SUMMARY

6    JUDGEMENT THAT THE EVIDENCE SIMPLY DOESN'T SUPPORT GOING

7    FORWARD.

8        I DON'T KNOW IF IT WILL, BUT YOU KNOW, I READ BOTH OF THE

9    NIKE DECISIONS, AND I THINK IT'S GOING TO BE APPROPRIATE TO DO

10   THE DE MINIMUS ANALYSIS AT THAT POINT IF YOU RAISE IT.  AND I'M

11   SURE YOU WILL, AND YOU SHOULD, BUT I'M RELUCTANT TO DO IT NOW

12   AT THIS STAGE.

13       AND I THINK YOU ARE ACTUALLY, AND ESPECIALLY GIVEN HOW YOU

14   CITED THE NIKE, I'M SORRY THE APPLE SUMMARY JUDGEMENT ORDER FOR

15   THIS MOTION, I FEEL THAT YOUR ARGUMENTS ACTUALLY BLEED INTO A

16   MERITS CONSIDERATION WHICH I'M RELUCTANT TO DO.

17          MR. MEER:  I UNDERSTAND THAT.  SO LET ME RETURN BACK

18   TO THE RULE 23(A) AND (B) ANALYSIS.

19          THE COURT:  SURE.

20          MR. MEER:  IN A CASE THAT WE'VE CITED FROM THE

21   NORTHERN DISTRICT OF CALIFORNIA ORTIZ V. CVS, THERE WAS A

22   POLICY ALLOWING FOR ADJUSTMENT OF TIME AND THE COURT DENIED

23   CERTIFICATION ON THE GROUNDS THAT THE PLAINTIFFS COULD NOT SHOW

24   THAT EMPLOYEES WHO SOUGHT EXTRA TIME WERE DENIED THE EXTRA

25   TIME.

1   AND IN THAT CASE THERE WAS A VERY, VERY SMALL PERCENTAGE OF

2   TIME ADJUSTMENTS.  THE TIME ADJUSTMENTS WERE FOR MINUTE

3   AMOUNTS.  BUT THE COURT SAID IF AN EMPLOYER HAS A POLICY THAT

4   ALLOWS FOR ADJUSTMENT OF TIME AND THERE IS NO EVIDENCE THAT THE

5   POLICY IS NOT BEING ADHERED TO, THEN CLASS CERTIFICATION IS

6   INAPPROPRIATE.

7   THAT'S ON PAGE 5 OF OUR OPPOSITION PAPERS WHERE THE

8   NORTHERN DISTRICT OF CALIFORNIA SAID THAT THE COURT WOULD HAVE

9   TO CONDUCT MINI TRIALS OF ALL PUTATIVE CLASS MEMBERS TO

10  DETERMINE WHICH EMPLOYEES HAD BEEN UNCOMPENSATED OFF-THE-CLOCK

11  AND WHETHER THE EMPLOYEE WAS PAID OR NOT PAID FOR TIME RECORD

12  ADJUSTMENTS.

13  I'M ON PAGE 5 OF OUR OPPOSITION AT LINE 6 THROUGH 21.  AND

14  AS THE COURT STRESSED AT STAR TEN, THERE ARE DECLARATIONS WHERE

15  PEOPLE SAY I WORKED OFF THE CLOCK AND I WAS NOT PAID, BUT IN

16  THE BLOCK QUOTE AT LINE 18 AND 19, THE COURT STRESSED, BUT

17  THESE DECLARATIONS DO NOT SAY DEFENDANTS REFUSED COMPENSATION

18  ONLY THAT THE DECLARANTS DID NOT ASK FOR IT.

19  AND THEREFORE YOU HAVE A SITUATION WHERE WHEN YOU HAVE

20  9,000 EMPLOYEES AS WE DO HERE, SOMEBODY WHO WAITS TEN SECONDS

21  MAY NOT EVER ASK FOR A BAG CHECK.  SOMEBODY WHO WAITS FOR

22  15 SECONDS MAY NOT ALWAYS ASK FOR AN ADJUSTMENT.  IF SOMEBODY

23  WAITS FOR TEN SECONDS MAY ALWAYS ASK FOR AN ADJUSTMENT.

24  SOMEBODY WHO ONLY BRINGS A SMALL BAG AND NEVER HAS TO BREAK

25  THEIR STRIDE MIGHT --

```
 1              THE COURT:  I GUESS IT'S DIFFERENT THOUGH BECAUSE I'M
 2    LOOKING AT PAGE 5 OF THE REPLY BRIEF FROM THE PLAINTIFFS WHERE
 3    THEY ADDRESS THE ORTIZ CASE IN SOME DETAIL.  AND THERE THE
 4    ISSUE WAS OFF-THE-CLOCK DELIVERIES.
 5              SO THE COURT, I DON'T HAVE THE ORTIZ CASE PRINTED OUT HERE
 6    WITH ME RIGHT NOW, BUT WHAT PLAINTIFFS SUGGEST IS THAT IN ORTIZ
 7    NOT EVERY EMPLOYEE PERFORMED THE WORK.  THE DELIVERIES
 8    OFF-THE-CLOCK, AND THAT THERE WAS EVIDENCE THAT MANY OF THEM
 9    ACTUALLY UPON REQUEST, DID GET COMPENSATED.  AND THERE WAS NO
10    EVIDENCE THAT THE MANAGERS ACTUALLY EVEN KNEW OF THE WORK BEING
11    DONE.
12              HERE, THE MANAGERS, NIKE KNOWS EVERYONE GOES THROUGH THE
13    BAG CHECK.  THAT'S OBVIOUS, THAT'S THEIR POLICY.  AND THEY KNOW
14    THAT THEY HAVE TO HAVE A MANAGER OR SOMEONE AUTHORIZED TO
15    PERFORM THE CHECK.  AND THEY KNOW THAT THAT PERSON CAN'T ALWAYS
16    BE THERE.  THEY KNOW OF ALL THOSE CIRCUMSTANCES.
17              THE INDIVIDUAL WHO ACTUALLY PERFORMS THE BAG CHECK IS AT
18    LEAST A SUPERVISORY EMPLOYEE, IF NOT A MANAGER.
19              AND SO IT SEEMS TO ME AT THIS STAGE THAT IT'S REASONABLE TO
20    SAY THAT IF A PERSON IS AUTHORIZED BY NIKE TO CARRY OUT THE
21    POLICY OF THE CHECK, THAT THAT PERSON KNOWS WHETHER THERE'S
22    BEEN A DELAY OR NOT IN ASSISTING THE EMPLOYEE COMING THROUGH
23    THE BAG CHECK, AND THEREFORE NIKE IS ON NOTICE OF IT.
24              SO THERE'S -- IT'S NOT -- I DON'T THINK IT'S AS NARROW AS
25    THE STORE MANAGER OR THE ASSISTANT MANAGER BEING AWARE OF THE
```

1    DELAY, BUT RATHER THE DESIGNEE OF THE STORE MANAGER WHO

2    PERFORMS THE BACK CHECK I THINK ROADWAYS THE KNOWLEDGE OR

3    CONSTRUCTIVE KNOWLEDGE TO NIKE OF THE CIRCUMSTANCES THAT ARE

4    GOING ON AT THE BAG CHECK.

5            MR. MEER:  AND EVEN TAKING THAT EVERYBODY WHO HAS

6    EVEN THE LOWEST LEVEL MANAGERIAL DISTINCTION WOULD BE ON NOTICE

7    FOR LEGAL PURPOSES OF THAT.

8        THERE ARE ONLY ISOLATED INSTANCES WHERE SOMEBODY HAS TO

9    WAIT.  I MEAN, WE'VE GOT DECLARATIONS ON PAGE 13 OF OUR

10   OPPOSITION FROM NUMEROUS EMPLOYEES AND MANAGERS SAYING, I NEVER

11   HAVE TO WAIT.

12           THE COURT:  BUT DOESN'T THAT GO TO THE DE MINIMUS

13   ISSUE THAT I WILL GET TO LATER?

14           MR. MEER:  THE DE MINIMUS ISSUE WOULD GO TO, DO

15   PEOPLE HAVE TO WAIT, AND IF THEY HAVE TO WAIT THREE MINUTES, WE

16   WOULD ARGUE THAT'S DE MINIMUS.

17       BUT THE IDEA, AS THE COURT HAD NOTED, THAT SOMEBODY HAS TO

18   WALK OUT THE DOOR, TOUCH THE DOOR KNOB AND OPEN IT AND WALK

19   THROUGH IT IS ABSOLUTELY UNAVOIDABLE IN ANY WORKPLACE FOR ANY

20   EMPLOYER.

21       AND SO IF THERE IS NO WAITING FOR A MANAGER AND THE BAG

22   CHECK TUESDAY TAKES TWO SECONDS, THEN THAT'S NOT EVEN A DE

23   MINIMUS ARGUMENT, THAT'S AN ARGUMENT THAT THERE WAS NO EFFECT

24   ON THE EMPLOYEES WORKDAY.  THEY WERE DOING SIMPLY WHAT THEY

25   WOULD BE DOING ANYWAY, WHICH IS, MY SHIFT IS DONE, GOO BYE JIM,

1      HERE'S MY BAG, AND THEY WALK OUT.

2          AND THE EVIDENCE IN THE RECORD SHOWS THAT THAT IS THE

3      MAJORITY OF CASES.  AND IN THE CASES WHERE SOMEBODY MIGHT HAVE

4      TO WAIT FOR A MANAGER TO DO THAT, THERE'S NO WAY TO DETERMINE

5      WHICH INSTANCES --

6              THE COURT:  WELL, THIS CASE IS SET UP MORE CLEARLY IF

7      WE'VE GOT AN ENORMOUS FACTORY AND THE WHISTLE BLOWS AT THE END

8      OF THE SHIFT AND 300 PEOPLE LEAVE AT THE SAME TIME.  THAT'S AN

9      EASIER CASE.  BECAUSE THEN THERE'S A LINE.  AND THEN --

10             MR. MEER:  YES.

11             THE COURT:  BUT IN THESE STORES IT APPEARS THAT

12     BREAKS CERTAINLY ARE STAGGERED, THAT'S HOW STORES WORK.

13         AND THE END OF A SHIFT, I DON'T HAVE ANY EVIDENCE THAT IT'S

14     A LARGE NUMBER OF PEOPLE WHO FORM A LINE.  IN FACT, I DON'T

15     THINK THERE'S ANY EVIDENCE THAT DELAYS ARE CAUSED BY WAITING IN

16     LINE FOR FELLOW WORKERS WHO ARE AHEAD OF ME.

17             MR. MEER:  THERE'S NO EVIDENCE OF THAT AND THERE IS

18     EVIDENCE IN THE RECORD THAT THERE IS A MANAGERIAL EMPLOYEE ON

19     STAFF WHO CAN DO THESE BAG CHECKS FOR EVERY FIVE EMPLOYEES IN

20     THE STORE.

21         SO IT'S NOT AN INSTANCE WHERE IT'S ONLY ONE PERSON AND

22     THERE ARE A HUNDRED PEOPLE WAITING.

23             THE COURT:  I GUESS WHAT I STILL COME BACK TO IS THAT

24     IT'S THAT DIFFICULT PLACE OF DRAWING THE LINE BETWEEN MERITS

25     DETERMINATIONS AND CLASS CERTIFICATION AND JUST LOOKING AT

1    CERTIFYING THE CLASS.

2         SO I APPRECIATE WHAT YOU ARE SAYING, IN READING YOUR PAPERS

3    I WAS NOT PERSUADED THAT THE WAIT TIME POLICY WAS GOING TO PUT

4    AN END TO THE ISSUE OF ASCERTAINABILITY OF THE CLASS AS YOU

5    SUGGEST OR COMMON ISSUES OF PROOF.

6         I WILL CERTAINLY TAKE A LOOK AT THAT, BUT I THINK THAT THE

7    ISSUES YOU RAISE REALLY ARE, WOULD BE THE ISSUES IN ANY OF

8    THESE BAG CHECK CASES WHERE I MEAN, FRANKLY, THESE CLASSES ARE

9    BEING CERTIFIED IN MANY, MANY CASES.

10        YOU HAVE SOME DIFFERENT FACTS WITH YOUR WAIT TIME POLICY, I

11   REALLY APPRECIATE THAT.  AND FRANKLY, I DON'T KNOW WHEN THAT

12   POLICY CAME INTO PLAY, BUT TO THE EXTENT IT WAS IN REACTION TO

13   WHAT WAS GOING ON IN THESE CASES THAT'S CERTAINLY SOMETHING TO

14   ALLOWED THE COMPANY FOR RECOGNIZING THAT.  I DON'T KNOW IF

15   THAT'S FLUFF.  I DON'T KNOW IF THAT'S THE GENESIS OF THE

16   POLICY.

17             MR. MEER:  THERE'S NOTICE THAT THE POLICY WAS FOR THE

18   ENTIRE CLASS PERIOD.  AND AS A PRACTICAL MATTER THERE'S NOTHING

19   ELSE THAT AN EMPLOYER CAN DO.

20        WE COULD GET A HUNDRED MILLION DOLLAR VERDICT AGAINST US

21   AND WE STILL CAN'T STOP PEOPLE FROM HAVING TO WALK OUT THE DOOR

22   AFTER THEY CLOCK OUT.  AS THE COURT NOTED, YOU CAN'T HAVE A

23   TIME CLOCK OUTSIDE THE STORE.

24        SO IN THIS CASE WITH THE EXTRA PAY IN THE ORTIZ CASE, THOSE

25   WERE EVEN LONGER AMOUNTS OF OFF-THE-CLOCK TIME.  AND A MORE,

1    EVEN MORE UNIFORMITY OF EMPLOYEES HAVING TO WORK THAT TIME

2    OFF-THE-CLOCK.

3              THE COURT:  BUT MY RECOLLECTION -- IN ORTIZ NOT

4    EVERYONE MADE OFF-THE-CLOCK DELIVERIES.  HERE EVERYONE GOES

5    THROUGH SECURITY.  I THINK THAT'S A BIG DIFFERENCE.

6              MR. MEER:  AGAIN, WHEN WE TALK ABOUT GOING THROUGH

7    SECURITY HOWEVER, THE GOING THROUGH SECURITY IS, IF WE LOOK AT

8    TWO STAGES, WAITING FOR THE SECURITY AND THEN THE ACTUAL ACT OF

9    THE INSPECTION.  THE ACTUAL ACT OF THE INSPECTION AND THE

10   TESTIMONY FROM ALL SOURCES HAS BEEN IS TWO SECONDS OR

11   THREE SECONDS.

12        AND SO TO SAY THAT THESE FOLKS ARE UNDER THE CONTROL OF THE

13   EMPLOYER, AGAIN, THEY HAVE TO WALK OUT OF THE STORE ANYWAY.

14        AND SO WE ARE LEFT WITH THE SITUATION OF PEOPLE NEEDING TO

15   WAIT FOR A MANAGER TO DO THIS, AND THE TESTIMONY IS FROM THE

16   MAJORITY OF WITNESSES THAT THEY NEVER HAVE TO WAIT FOR A

17   MANAGER.

18        AND WE CAN'T HAVE A CLASS WHEN IT'S IMPOSSIBLE TO DETERMINE

19   WHO HAS TO WAIT FOR A MANAGER AND WHO DOESN'T.

20        AND THAT COULD BE A FUNCTION OF A MYRIAD OF INDIVIDUALIZED

21   ISSUES INVOLVING THE SHIFT OF SOMEBODY IS ON THE SIZE OF THE

22   STORE, THE NUMBER OF EMPLOYEES WORKING THE LEVEL OF BUSINESS

23   ACTIVITY, THE TYPE OF SHIFT IF IT'S A CLOSING SHIFT AT THE END

24   OF THE DAY OR IF IT'S JUST SOMEBODY EXITING BEFORE THE CLOSING

25   SHIFT.

1    WHETHER IT'S A STORE WITH A DEMOGRAPHIC WITH WHERE SOME

2    STORES HAVE TWO PEOPLE STATIONED AT THE DOOR ALL THE TIME

3    BECAUSE THERE'S SUCH A HIGH THEFT.  SOME STORES HAVE SOMEBODY

4    WHO IS SUPPOSED TO BE BETWEEN THE CASH WRAP AND THE DOOR.

5        AND SO THERE'S NO UNIFORMITY IN TERMS OF HOW LONG SOMEBODY

6    MIGHT HAVE TO WAIT.  BUT BECAUSE OUR POLICY IS TO HAVE SOMEBODY

7    BY THE DOOR SO OFTEN AS ALL THESE DECLARANTS SAY, THAT'S WHY IT

8    MAKES SENSE THAT YOU WOULD HAVE ONLY 571 TIME ADJUSTMENTS.

9        BUT THAT CERTAINLY SHOWS THAT THIS WAS WELL KNOWN.  I THINK

10   THE MORE IMPORTANT PART OF THAT FOR THE COURT'S ANALYSIS IS

11   THAT OF THE 360 MANAGERS, 190 HAD MADE TIME ADJUSTMENTS AT ONE

12   TIME OR ANOTHER.  OF THE 35 STORES TIME ADJUSTMENTS HAD

13   OCCURRED IN 31 STORES.

14       THE COURT:  THE TROUBLE WITH THAT STATISTIC, AS THE

15   PLAINTIFFS POINT OUT, IS THAT OF THE 190 MANAGERS WHO MADE TIME

16   ADJUSTMENTS, EXCEPT ANECDOTALLY, I DON'T HAVE ANY EVIDENCE THAT

17   IT'S FOR THIS WAIT TIME, AS OPPOSED TO, ANOTHER CIRCUMSTANCE

18   THAT THE POLICY WOULD APPLY TO OF A MANAGER SIMPLY BEING LATE

19   TO OPEN UP THE STORE, WHICH IS IN THE NOTES THAT WERE PROVIDED,

20   THAT THAT IS, THAT IS A NOTED REASON.  AND I'M NOT SAYING IT

21   EXCLUDES OTHER THINGS, BUT THAT IS THERE.

22       SO WHAT I'M REALLY CONFRONTED BY IS WILL ANECDOTAL EVIDENCE

23   FROM SOME MANAGERS DEFEAT CLASS CERTIFICATION.  AND I'M

24   STRUGGLING WITH THAT.

25       MR. MEER:  LET ME TRY AND ANSWER THAT, YOUR HONOR.

1    WE'VE GOT ANECDOTAL EVIDENCE FROM SEVEN MANAGERS THAT THEY

2    DO THIS.  THEN PLAINTIFF SAYS, I WILL GET ANECDOTAL EVIDENCE

3    FROM SEVEN EMPLOYEES.  THEY HAVEN'T.  SO FAR THE WEIGHT OF THE

4    ANECDOTAL EVIDENCE IS CLEARLY ON THE SIDE OF THE DEFENDANT.

5    BUT SAY PLAINTIFF SAYS, I HAVE SEVEN DECLARANTS OR

6    WITNESSES WHO SAID I DIDN'T GET THIS.  SO THEN WE GET SEVEN

7    MORE, AND THEN THEY GET SEVEN MORE.  AND WE COULD PROBABLY HAVE

8    A TRIAL WITH 100 WITNESSES ON OUR SIDE AND 100 WITNESSES ON

9    THEIR SIDE BUT THAT'S WHY COURTS DENY CLASS CERTIFICATION WHERE

10   ANECDOTAL EVIDENCE IS THE ONLY WAY TO PROVE OR DISPROVE A

11   POINT.

12   AND BECAUSE PLAINTIFFS HAVE THE BURDEN NOT ONLY ON CLASS

13   CERTIFICATION BUT ON THE BURDEN OF SHOWING THAT THERE WAS TIME

14   WORKED OFF-THE-CLOCK BECAUSE EMPLOYEES ARE PRESUMED TO BE PAID

15   FOR ALL TIME WORKED, THEN PLAINTIFFS HAVE NOT EVEN COME CLOSE

16   TO THE WEIGHT OF OUR EVIDENCE WHERE WE'VE SAID THAT THERE IS NO

17   WAITING FOR A MANAGER TO CONDUCT THIS BAG CHECK.

18   AND I CAN'T SEE HOW THEY WOULD BE ABLE TO WITH A TRIAL

19   PLAN, IF THEY PUT UP AN EMPLOYEE WHO SAYS IN THIS STORE IN THE

20   NIKE TOWN IN UNION SQUARE, I ALWAYS HAD TO WAIT.

21   THE COURT:  IN FACT, WE ARE GOING TO HAVE SAMPLING,

22   AREN'T WE?  IN FACT, IN A CASE LIKE THIS IN THE SAMPLING, YOU

23   WILL DO SAMPLING AS WELL, COULD SHOW THAT THE WAIT TIME IS

24   THREE SECONDS.

25   AND THEN BASED ON THAT EVIDENCE, WE DON'T HAVE TO DO

```
1      ANYTHING.  I MEAN, THAT'S WHERE I WONDER THAT'S WHY I THINK

2      THIS REALLY IS ALL OF THESE ARGUMENTS FEED INTO THE DE MINIMUS

3      ARGUMENT.  AND I'M CERTAINLY NOT GOING TO DO THAT NOW, THAT'S

4      NOT GOING TO BE PART OF MY ANALYSIS, BUT IT WILL BE AT SOME

5      POINT IF THE CASE GOES FORWARD.

6          SO I DON'T KNOW WHY THE SAMPLING WOULDN'T BE THE

7      APPROPRIATE WAY TO FLUSH OUT EXACTLY WHAT YOU ARE TALKING

8      ABOUT.  IT'S EXPENSIVE, I DO KNOW THAT.

9              MR. MEER:  THERE'S SAMPLING AND THEN THERE'S

10     ABSOLUTE.  ON THE ISSUE OF IT TAKING TWO SECONDS, THE EVIDENCE

11     IS ABSOLUTE, WE DON'T NEED A SAMPLE.  NOBODY HAS SAID THAT IT

12     TAKES MORE THAN TWO SECONDS FOR THE BAG CHECK ITSELF.

13             THE COURT:  BUT THIS IS NOT ABOUT THE TIME IT TAKES

14     TO PERFORM THE ACTUAL CHECK WHEN IT'S THE EMPLOYEE'S TURN.

15             MR. MEER:  WHEN YOU LOOK AT THE, FROM START TO FINISH

16     FROM THE TIME THE EMPLOYEE CLOCKS OUT TO THE TIME THE EMPLOYEE

17     WALKS OUT THE DOOR --

18             THE COURT:  SO THAT'S NOT WHAT THE CASE IS ABOUT

19     EITHER.  THAT'S WHY I ASKED MR. ROSENTHAL WHEN WE STARTED I

20     WANTED TO JUST BE CLEAR THAT, THEY SEEM TO AGREE WITH YOU THAT

21     THERE'S NO PROBLEM WITH WHERE THE TIME CLOCK IS LOCATED, AND

22     THE TIME TO PASS THROUGH THE STORE TO GET OUT IS NOT AN ISSUE.

23         AND SO -- AND, I MEAN, WITHOUT, THEY DON'T CONTEST YOUR

24     ARGUMENT THAT EMPLOYEES WAIT FOR BUSES, MAKE PHONE CALLS, WAIT

25     FOR THEIR BUDDY TO GET OFF WORK, WANT TO DO SOME PERSONAL
```

1     SHOPPING, NONE OF THAT IS COMPENSABLE.  THEY DON'T ARGUE THAT

2     AT ALL.

3          SO THIS CASE IS REALLY ABOUT WHEN THE EMPLOYEE PRESENTS HIM

4     OR HERSELF AT THE FRONT DOOR IN ORDER TO LEAVE, THEN WE ARE

5     LOOKING AT THAT PERIOD OF TIME FROM THE TIME THE EMPLOYEE

6     PRESENTS HIM OR HERSELF TO THE TIME THEY ARE OUT THE DOOR AND

7     WHETHER THERE'S WAIT TIME.

8          SO I DON'T KNOW WHY SAMPLING WOULDN'T APPLY.  AND I IMAGINE

9     YOU HAVE VIDEOTAPE ON THIS, DON'T YOU, BECAUSE THIS IS A

10    SECURITY PLACE?  I MEAN, YOU DIDN'T PRESENT ANY OF THAT.

11              MR. MEER:  AND PLAINTIFFS WILL AGREE AND THE

12    VIDEOTAPE HAS BEEN THE SUBJECT OF MOTIONS IN THE DISCOVERY

13    CONTEXT.  BUT A VIDEOTAPE DOESN'T SHOW WHY SOMEBODY IS WAITING.

14    AND IT DOESN'T NECESSARILY SHOW WHO IS A CUSTOMER AND WHO IS AN

15    EMPLOYEE.

16         AND IT DOESN'T NECESSARILY SHOW WHAT SOMEBODY IS DOING

17    WHILE THEY ARE WAITING.  AND THE VIDEOTAPE IS ONLY AT THE CASH

18    REGISTER AND SOMETIMES AT THE DOOR.  SO SOMEBODY MIGHT BE

19    WAITING 10 FEET AWAY FROM THE DOOR AND THEY WOULDN'T BE CAUGHT

20    ON THE VIDEOTAPE.

21              THE COURT:  I SEE.

22              MR. MEER:  SOMEBODY MIGHT BE WAITING RIGHT AT THE

23    DOOR BECAUSE THEY WANT TO LOOK THROUGH THE GLASS AND SEE THEIR

24    RIDE APPROACH.

25              THE COURT:  SURE, SURE.

1          MR. MEER:  THEIR UBER CAR.  AND THE VIDEOTAPE CREATES

2     MORE TROUBLE THAN IT'S WORTH.

3        THE OTHER ISSUE WITH THE VIDEOTAPE IS THAT IT'S

4     EXCRUCIATING FOR SOMEBODY TO LOOK THROUGH 12 HOURS OF

5     VIDEOTAPE.

6          THE COURT:  THAT'S WHY YOU HIRE EXPERTS, THAT'S THEIR

7     JOB.  BUT I HEAR YOU.  I CAN UNDERSTAND THAT THAT'S

8     PROBLEMATIC.

9          MR. MEER:  SO THE VIDEOTAPE DOESN'T REALLY SHED ANY

10    LIGHT ON IT.

11        SO IF WE DID SAMPLING, THE SAMPLING WOULD STILL BE SUBJECT

12    TO DIRECT EXAMINATION AND CROSS-EXAMINATION FOR THE CREDIBILITY

13    BECAUSE --

14          THE COURT:  WELL, IT'S GOING TO BE SUBJECT.

15        IF YOU DO SAMPLING IT'S GOING TO BE, I MEAN, THE EXPERT IS

16    GOING TO COME INTO COURT WITH THE RESULTS OF THE SAMPLING AND

17    THE, I MEAN, I DON'T KNOW HOW YOU ARE ACTUALLY GOING TO PRESENT

18    THAT, BUT GENERALLY THAT SAMPLING WE DON'T HEAR FROM ALL OF THE

19    INDIVIDUALS WHO ARE SUBJECT TO THE SAMPLING.

20          MR. MEER:  BUT I THINK THIS TYPE OF SAMPLING IS

21    INHERENTLY UNRELIABLE BECAUSE.

22          THE COURT:  THAT'S FOR A JURY TO DECIDE.

23          MR. MEER:  OR THE COURT ON SUMMARY JUDGEMENT.

24          THE COURT:  NO, NO, UN RELIABILITY IS NOT SOMETHING,

25    UNLESS IT'S COMPLETELY INCLUDABLE.

1          MR. MEER:  YES, I'M SORRY ASSUMING THAT THE SAMPLING

2     PRESENTED BY BOTH SIDES SHOWS THAT THE END TO END PART OF THE

3     PROCESS FROM THE EMPLOYEE ATTEMPTING TO BE IN THE BAG CHECK TO

4     THE EMPLOYEE FINISHING THE BAG CHECK AND WALKING OUT THE DOOR

5     IS A TWO-MINUTE INSTANCE WITH A MARGIN OF ERROR OF A 95 PERCENT

6     CONFIDENCE LEVEL, THEN THAT WOULD BE, AS I UNDERSTAND THE

7     COURT, I'M NOT TRYING TO PIN ANYBODY DOWN WITH A RULING, BUT

8     THAT WOULD BE THE TYPE OF ISSUE THAT WOULD BE RIPE FOR SUMMARY

9     JUDGEMENT.

10          THE COURT:  YOU KNOW, THE WAY YOU -- IF BOTH PARTIES

11    AGREE THAT THAT'S THE AMOUNT OF TIME THAT THE SAMPLING SHOWS

12    IS, YOU KNOW, IF YOU HAD A NEUTRAL WHO PERFORMED THE SAMPLING

13    AND GAVE ME, OR IF YOU JUST ADOPTED THE PLAINTIFF'S EVIDENCE ON

14    THAT ISSUE THEN THE FACTS ARE NOT IN DISPUTE THEN I APPLY THE

15    LAW TO IT.

16      THAT WOULD BE A WONDERFUL SUMMARY JUDGEMENT MOTION.  THAT'S

17    THE ONE THAT I WOULD LOOK FORWARD TO BECAUSE THEN I COULD JUST

18    APPLY THE LAW TO THE AN AGREED UPON AVERAGE AMOUNT OF TIME.

19          MR. MEER:  I DON'T THINK PLAINTIFFS DISPUTE THAT THE

20    AVERAGE AMOUNT OF TIME OR EVEN THE HIGH AND LOW END AMOUNT OF

21    TIME IS ABOVE WHAT THE NINTH CIRCUIT HAS SAID IS DE MINIMUS.

22      IF YOU LOOK AT THE RUTTI V. LOJACK CASE WHERE THEY USE A

23    TEN-MINUTE STANDARD, I DON'T THINK EVEN PLAINTIFFS ARE SAYING

24    THAT THERE'S A TEN-MINUTE PER DAY DELAY.  I THINK AT MOST THEY

25    ARE SAYING THAT THERE'S A TWO-MINUTE AND THERE MAY BE SOME OUT

1    LIARS OF LONGER AND AS WE HAVE SAID THE MAJORITY OF TIME WE

2    BELIEVE THERE'S HAD --

3              THE COURT:  WELL, WE DON'T CERTIFY A CLASS FOR A FEW

4    OUTLIERS.  I APPRECIATE THAT.  I'M NOT SURE I CAN TELL THAT NOW

5    SO THAT'S A PROBLEM.

6        ALL RIGHT.  LET ME HEAR FROM MR. ROSENTHAL.  I REALLY

7    APPRECIATE IT.  THE CASE ITSELF PRESENTS SOME REALLY

8    INTERESTING ISSUES, AND MY JOB IS TO JUST MAKE SURE I DON'T

9    BLEED INTO SOME OF THOSE THAT ARE NOT APPROPRIATE FOR DECISION

10   AT THIS POINT.

11             MR. MEER:  I UNDERSTAND, YOUR HONOR.

12             THE COURT:  BUT I DON'T MEAN TO SUGGEST YOUR

13   ARGUMENTS AREN'T REALLY IMPORTANT.  AND FRANKLY, YOU MAY WIN

14   THE DAY ON THEM, BUT I DON'T KNOW THAT YOU WILL ON THE CLASS

15   CERT.

16       THANK YOU.

17       MR. ROSENTHAL, LET ME HEAR YOUR RESPONSES.

18             MR. ROSENTHAL:  CERTAINLY, YOUR HONOR.

19       FIRST OF ALL, MR. MEER IS HELL BENT ON CONVINCING THE COURT

20   THAT THE AMOUNT OF ACTUAL WAITING TIME AND THE BAG CHECKS

21   THEMSELVES TOOK TWO SECONDS.  THAT WAS THE NUMBER HE KEPT ON

22   GIVING THE COURT.

23       IN FACT, I DEPOSED PERSONALLY A NUMBER OF DEFENDANT'S

24   DECLARANTS, MANAGERIAL DECLARANTS.  AND NONE OF THEM TESTIFIED

25   TO THAT.  OVERWHELMINGLY, THEY SAID IT WAS AT LEAST 30 SECONDS

1   PROBABLY MORE THAN THAT.  AND THEY ALL ALSO SAID -- ACTUALLY

2   NOT ALL OF THEM, A NUMBER OF THEM SAID THEY WEREN'T AWARE OF

3   THE WAITING TIME POLICY.

4       BUT TO THOSE WHO ACTUALLY WERE AWARE OF IT THEY SAID THEY

5   WOULDN'T EVEN RECONSIDER REIMBURSING AN EMPLOYEE UNTIL THEY

6   REACHED MAYBE THE 3 OR 4-MINUTE THRESHOLD.

7       IN TERMS OF THE POLICY ITSELF, YOUR HONOR, I ACTUALLY HAVE

8   A COPY OF IT HERE.

9           THE COURT:  GREAT.

10          MR. ROSENTHAL:  IT'S INTERESTING BECAUSE THERE'S NO

11  MANDATE IN IT THAT TIME SPENT WAITING FOR SECURITY CHECKS

12  SHOULD BE COMPENSATED.

13          THE COURT:  IT DOESN'T DEFINE IT AT ALL, DOES IT.

14          MR. ROSENTHAL:  IT DOESN'T DEFINE THE TERM AT ALL.

15      BUT BEYOND THAT, IT SAYS SOME OF THE CATEGORIES BELOW MAY

16  QUALIFY AS ACTUAL HOURS WORKED DEPENDING ON THE CIRCUMSTANCES.

17  AND THEN IT LISTS WAITING TIME.  AND THEN IT SAYS, CONTACT YOUR

18  BUSINESS HR GENERALIST, EMPLOYER RELATIONS SPECIALIST OR

19  COMPENSATION SPECIALIST IF YOU HAVE ANY QUESTIONS ABOUT WHETHER

20  TIME QUALIFIES AS HOURS WORKED.

21          THE COURT:  AND THIS IS IN THE EMPLOYEE HANDBOOK,

22  CORRECT?

23          MR. ROSENTHAL:  CORRECT, YOUR HONOR.

24          THE COURT:  AND THEN THIS GOES TO BOTH THOSE

25  PERFORMING THE SECURITY CHECK AND THOSE GOING THROUGH THE

1    SECURITY CHECK.

2              MR. ROSENTHAL:  YES.

3         HOWEVER, I WOULD POSIT THAT THE VAST MAJORITY OF EMPLOYEES

4    WERE NOT AWARE THAT WAITING TIME ACTUALLY COVERED SECURITY

5    CHECKS.

6         CERTAINLY THE TERM IS NOT DEFINED AND I BELIEVE EVERY

7    MANAGER THAT I DEPOSED SAID THAT EMPLOYEES WERE NOT TRAINED ON

8    THIS SPECIFIC POLICY.

9         SO IN TERMS OF THE ACTUAL AMOUNT OF TIME SPENT WAITING FOR

10   AND UNDER GOING THE BAG CHECKS, NO ONE SAID TWO SECONDS.  IN

11   TERMS OF THE TIME SPENT CUMULATIVELY BETWEEN WAITING AND

12   UNDERGOING IT.

13             THE COURT:  SOME OF THE EMPLOYEES SAY WHEN THEY HAD

14   NO BAGS THEY JUST WAIVED RIGHT THROUGH.

15             MR. ROSENTHAL:  A FEW MAY HAVE SAID THAT, HOWEVER

16   THEY STILL HAD TO WAIT FOR THE SECURITY CHECKS.

17        MR. MEER MISREPRESENTS THE EVIDENCE IN THIS CASE WHEN HE

18   SAYS THERE WAS ALWAYS A MANAGER STATIONED AT THE FRONT OF THE

19   STORE.

20        NOT SO.  PERHAPS ON CERTAIN VERY BUSY OCCASIONS THERE WAS A

21   MANAGER STATIONED NEAR THE CASH REGISTER, BUT THERE WAS NEVER A

22   MANAGER WAITING AT THE FRONT OF THE STORE.

23        IN TERMS OF MR. MEER'S ARGUMENT THAT IT'S HARD TO

24   DIFFERENTIATE BETWEEN EMPLOYEES WHO ARE MAYBE JUST WAITING FOR

25   A BUS OR ARE JUST TALKING ON THEIR CELL PHONE, THAT'S A

1      COMPLETELY NEW ARGUMENT.  IT WASN'T RAISED IN THEIR PAPERS.  I

2      REALLY DOUBT THAT NIKE WOULD PERMIT EMPLOYEES WHO ARE

3      OFF-THE-CLOCK TO JUST LOITER AT THE FRONT OF THE STORE.

4            THE COURT:  HE WAS COMMENTING ON WHY THE VIDEOTAPES

5      ARE HARD TO DECIPHER.

6         THAT'S ACTUALLY NOT BEFORE ME.  I WAS REALLY ASKING WHETHER

7      THOSE WERE AN AID AND I THINK HIS COMMENTS WERE LIMITED TO

8      WHAT'S AMBIGUOUS ABOUT THE VIDEO.  SO I TAKE THAT AS GENERAL

9      COMMENTS ON HOW VIDEOS CAN BE DIFFICULT TO DECIPHER.

10           MR. ROSENTHAL:  I UNDERSTAND, YOUR HONOR.

11           THE COURT:  BUT YOU DON'T THINK THAT ORTIZ SHOULD

12     GIVE ME PAUSE IN CERTIFYING THIS CLASS.

13           MR. ROSENTHAL:  NO.

14        I THINK THAT YOUR HONOR IS CORRECT.  ORTIZ INVOLVED TIME

15     THAT THE EMPLOYER WAS NOT EVEN AWARE OF IN MANY INSTANCES.  IT

16     INVOLVED TIME OFF SITE BY EMPLOYEES.  AND CERTAINLY THE COURT

17     WAS TROUBLED IN THAT CASE BY ALL THE INDIVIDUALIZED ISSUES

18     INVOLVING THAT TIME.  SOME EMPLOYEES MADE DELIVERIES, OTHERS

19     DIDN'T.

20           THE COURT:  SO WHAT HAPPENS IN THIS CASE?  THIS CLASS

21     IS QUITE LARGE AND WE'VE GOT JUST BASED ON THE EVIDENCE YOU'VE

22     GIVEN ME, THE EMPLOYEES THEMSELVES DESCRIBE A CONTINUUM AMOUNT

23     OF TIME IT TAKES THEM TO GET THROUGH SECURITY CHECK.  AND SOME

24     OF WHICH IS REALLY QUITE INSIGNIFICANT.  AND BECAUSE THIS

25     POLICY APPLIED TO EVERYONE, NOT JUST PEOPLE WITH BAGS, THERE

1    WAS NO WAY AROUND IT.

2         BUT FOR SOMEONE WITH NO BAGS, THEY DESCRIBE A PRETTY SMOOTH

3    PROCESS THROUGH, AND I WOULD HAVE TO GO BACK AND SEE IF THEY

4    QUANTIFY IT TO BE LESS THAN 30 SECONDS, BUT TWO OF THOSE HAD TO

5    WAIT FOR THE MANAGER AND MIGHT HAVE SPENT THREE, MINUTES,

6    5 MINUTES, MORE TIME.

7         SO SOME OF THESE INDIVIDUALS, AM I GOING TO END UP IN

8    INDIVIDUAL INQUIRIES WHEN I HAVE SOME WHO TRULY ARE IN A

9    DE MINIMUS CIRCUMSTANCE, AND OTHERS WHO HAVE BEEN REASONABLY

10   INCONVENIENCED BY THIS WAIT TIME THAT'S COMPENSABLE?

11         MR. ROSENTHAL:  I THINK WE WILL FIND THAT THE VAST

12   MAJORITY OF EMPLOYEES WERE IN FACT INCONVENIENCED BY THESE

13   SECURITY CHECKS.

14         THE COURT:  AND OF COURSE THAT'S NOT THE TEST.  I USE

15   THAT WORD MYSELF.  BUT CAUSED TO WAIT.  AND UNDER THE RULES,

16   THAT I WOULD APPLY TO A DE MINIMUS EVALUATION.

17         MR. ROSENTHAL:  RIGHT.

18       AND I THINK THE MAJORITY OF EMPLOYEES IN FACT DID HAVE TO

19   WAIT SOME SIGNIFICANT PERIOD OF TIME, CERTAINLY MORE THAN TWO

20   SECONDS, YOUR HONOR.

21         THE COURT:  AND IN CLASS CERTIFICATION I LOOK TO

22   TRIAL MANAGEMENT ISSUES AS OPPOSED TO DECIDING THE MERITS OF

23   THE CASE, BUT WOULD YOU BE SUBMITTING STATISTICAL SAMPLING ON

24   THE QUANTUM OF WAIT TIME?

25         MR. ROSENTHAL:  YES, YES, YOUR HONOR.

```
1          THE COURT:  OKAY.  AND THEN IN TERMS -- SO EACH SIDE
2     WOULD PROVIDE ME WITH THEIR OWN STATISTICAL SAMPLING
3     POTENTIALLY.
4          MR. ROSENTHAL:  POTENTIALLY OR IF THE PARTIES COULD
5     AGREE ON A QUESTIONNAIRE THAT WOULD BE SENT OUT TO EMPLOYEES.
6          THE COURT:  RIGHT, RIGHT.
7          MR. ROSENTHAL:  IT COULD BE DONE JOINTLY.
8          THE COURT:  OKAY.
9       AND, WELL, I SUPPOSE THE QUESTIONNAIRES THEMSELVES COULD BE
10    FODDER FOR A MOTION TO DECERTIFY -- I DON'T KNOW.  I MEAN, I
11    DON'T KNOW WHY NOT.
12         MR. ROSENTHAL:  I MEAN, I WOULDN'T PUT IT PAST --
13         THE COURT:  OH, NO, I'M SAYING APPROPRIATELY.  I DONT
14    THINK IT'S INAPPROPRIATE AT ALL.
15      IF YOU ARE ACTUALLY GATHERING EVIDENCE LIKE YOU DO WITH
16    DEPOSITIONS OF WHAT EMPLOYEES ARE ACTUALLY EXPERIENCING, THEN
17    YOU KNOW, THAT RAISES -- AND APPROPRIATELY A MOTION TO
18    DECERTIFY IS COMMON.
19      SO ALTHOUGH WE HAVE -- OUR TRIAL DATE IS NOT THAT -- I
20    THINK WE ARE A LESS THAN A YEAR FROM TRIAL, AREN'T WE?
21         MR. ROSENTHAL:  TO BE HONEST, YOUR HONOR, I'M NOT
22    CERTAIN.
23         THE COURT:  DON'T WORRY, IT IS WHAT IT IS.  BUT YOU
24    WILL CHECK THAT.
25         ALL RIGHT.  ANYTHING ELSE YOU WANT TO ADDRESS BEFORE WE
```

```
 1    WRAP UP?
 2              MR. ROSENTHAL:  I WOULD JUST ASK, YOUR HONOR, THAT A
 3    STATUS CONFERENCE BE HELD IN ABOUT 90 DAYS BEFORE WE.  DO WE
 4    HAVE A TRIAL DATE SET?
 5              THE COURT:  I KNOW WE DO.
 6              MR. ROSENTHAL:  A STATUS CONFERENCE IN 90 DAYS,
 7    YOUR HONOR.
 8              THE COURT:  I THINK THAT MAKES SENSE.  NO OBJECTION
 9    TO THAT MR. MEER?
10              MR. MEER:  NO.  THERE WAS ONE FACTUAL COMMENT THAT I
11    WANTED TO RESPOND TO.
12              THE COURT:  SURE, OF COURSE.  WHY DON'T YOU GO AHEAD
13    AND DO THAT AND THEN WE WILL GIVE YOU A STATUS CONFERENCE DATE
14    AND WE WILL BE WRAPPED UP.
15              MR. MEER:  THE EVIDENCE IN THE RECORD IS UNDISPUTED
16    THAT NIKE'S POLICY IS THAT THERE IS ALWAYS A MANAGER AT THE
17    DOOR AT ALL TIMES.
18         ON PAGE 13 OF OUR OPPOSITION WE HAVE SEVEN DECLARANTS WHO
19    SAY, ONE OF THE MANAGERS ON DUTY GENERALLY THE ONE ASSIGNED AS
20    THE TEAM CAPTAIN IS TO REMAIN AT THE FRONT ENTRANCE.  THE
21    MANAGER ON THE SALES FLOOR IS AVAILABLE AT THE FRONT DOOR WHEN
22    I'M WALKING OUT.  ONE OF THE MANAGERS USUALLY REMAINS AT THE
23    ENTRANCE, ET CETERA.
24         SO WE'VE GOT SOME PEOPLE SAYING THAT THERE'S ALWAYS A
25    MANAGER EVERY TIME, SOME PEOPLE SAYING THERE'S USUALLY A
```

1  MANAGER WHEN I TRY TO LEAVE, AND THEN AGAIN, TALK ABOUT

2  ANECDOTAL EVIDENCE, THEY HAVE A COUPLE OF PEOPLE WHO SAY THAT I

3  HAVE TO WAIT FOR A MANAGER.

4      BUT THAT'S WHERE, WE CAN FIGHT ABOUT THE SIZE OF THE SAMPLE

5  AND WE CAN FIGHT ABOUT THE RELIABILITY OF IT, BUT THE

6  OVERWHELMING AMOUNT OF EVIDENCE IS THAT THERE IS SOMEBODY AT

7  THE FRONT DOOR, WHICH IS THE ONLY PLACE THAT EMPLOYEES LEAVE,

8  THERE IS A SEPARATE EMPLOYEE EXIT, THAT THERE'S ALWAYS SOMEBODY

9  AT THE FRONT DOOR TO CONDUCT THE BAG CHECKS.

10      AND THE TWO-SECOND INTERVAL THEY KEEP REFERRING TO IS FROM

11  PLAINTIFF'S OWN TESTIMONY WHERE THE CLASS REPRESENTATIVE

12  SAID --

13          THE COURT:  WELL, HE DIDN'T HAVE VERY MUCH

14  OPPORTUNITY TO EXPERIENCE IT, DID HE, IN HIS TEN DAYS OF

15  EMPLOYMENT.

16          MR. MEER:  WELL, IF HE'S ADEQUATE AND TYPICAL, THEN

17  WE CAN EXTRAPOLATE HIS TESTIMONY TO THE OTHER CLASS MEMBERS.

18  AND HE WAS WELL PREPARED FOR HIS DEPOSITION AND HE EASILY

19  CONCEDED THE TWO-SECOND AMOUNT.

20      AND SO I THINK WE DO HAVE AN INDIVIDUALIZED ISSUE ON THE

21  TIME IT TAKES FOR SOMEBODY TO BEGIN THE PROCESS WITH THE

22  MANAGER.

23      AND WITH RESPECT TO SURVEYS, I THINK SURVEYS ARE NOT

24  MANAGEABLE BECAUSE THERE'S A BIAS IN THEM.  WE WANT TO

25  CROSS-EXAMINE THE PEOPLE WHO FILL OUT THE SURVEY BECAUSE THEY

1        HAVE AN INCENTIVE TO EXAGGERATE THEIR TIME.

2               THE COURT:  WELL, IT'S NOT A FREE MOTION TO ASK 500

3        DEPOSITIONS, I WOULD LIKE TO SEE THAT ONE POSED TO THE

4        MAGISTRATE JUDGE.

5               MR. MEER:  WELL, I THINK WE CAN SELECT AN AGREED

6        NUMBER OF EMPLOYEES WHO SERVE AS THE SAMPLE AND TAKE THEIR

7        DEPOSITIONS.

8               THE COURT:  I THINK THAT WOULD NOT CAUSE A PROBLEM AT

9        ALL.

10              MR. MEER:  BUT IF THERE'S SURVEYS, I THINK THAT IT

11       WOULD CAUSE A PROBLEM BECAUSE THE SURVEYS ARE, WE DON'T EVEN

12       KNOW IF THEY ARE FILLED OUT BY THE PERSON WHO SIGNS THEM, WE

13       DON'T KNOW IF THEY HAVE A SPOUSE CHEERING THEM ON IN THE

14       BACKGROUND SAYING HEY, LET'S TRY AND GET SOME MORE MONEY ON

15       THIS.  WE DON'T KNOW IF PEOPLE EVEN HAVE AN UNDERSTANDING OF

16       WHAT THEY ARE READING AND WHAT THEY ARE SIGNING IS WHAT ITS

17       PURPOSE IS.

18          SO I THINK IF IT WE ARE GOING TO TRY TO PRESENT

19       REPRESENTATIVE EVIDENCE, IT HAS TO BE EVIDENCE THAT'S SUBJECT

20       TO DIRECT AND CROSS-EXAMINATION.  AND THAT'S WHERE THEY --

21              THE COURT:  SO THAT'S AN ATTACK ON SURVEYS AND I

22       THINK THAT YOU RAISE INTERESTING POINTS AND THAT WOULD PER

23       HAPPENS BE VERY POTENT REBUTTAL OR MAYBE EVEN THE SUBJECT MUCH

24       A DAUBERT MOTION FOR THE UN RELIABILITY OF THE METHODOLOGY.

25       BUT SURVEYS ARE ALLOWED.  WE KNOW THAT.  AND THEY HAVE TO BE

1    COMPETENT AND I DON'T KNOW ANY OF THE PARAMETERS OF IT.

2        SO YOU ARE SUGGESTING WHAT YOU WOULD BE INTERESTED IN DOING

3    TO ASSURE YOUR CLIENT THAT EITHER IT'S A VALID SURVEY OR TO

4    DEVELOP THE REBUTTAL TO IT OR THE ACTUAL EXCLUSION OF IT

5    THROUGH A DAUBERT HEARING, ALL OF WHICH IS APPROPRIATE.

6        BUT AT CLASS CERTIFICATION, I'M NOT GOING TO ANTICIPATE THE

7    UTTER FAILURE OF RELIABILITY OF A SURVEY.

8            MR. MEER:  I UNDERSTAND, YOUR HONOR.

9        LET ME ASK ONE MORE QUESTION.  HOUSEKEEPING ISSUE BECAUSE I

10   DON'T WANT TO BURDEN THE COURT WITH MORE PAPERS.

11       SINCE THIS MAY PROCEED TO A SUMMARY JUDGEMENT STAGE, I

12   WOULD LIKE FOR US TO BE ABLE TO BE THE MOVING PARTY RATHER THAN

13   HAVE CROSS MOTIONS FOR SUMMARY JUDGEMENT ON THIS

14           THE COURT:  I DON'T HAVE THE AUTHORITY.  I DON'T

15   THINK I HAVE THE AUTHORITY TO DESIGNATE.  I DON'T KNOW, YOU

16   KNOW, PLAINTIFF'S MOTIONS FOR SUMMARY JUDGEMENT RARELY GO

17   ANYWHERE, SO WHETHER -- HOW THAT WORKS IS HARD TO SAY.

18       IT DOESN'T APPEAR YOU HAVE A TRIAL DATE AND I'M ACTUALLY

19   DISTURBED BY THAT AND THAT'S MY OWN FAILURE BECAUSE I NORMALLY

20   SET A TRIAL DATE VERY EARLY ON.  AND I DON'T KNOW WHAT HAPPENED

21   IN MY CASE MANAGEMENT.  WE MUST HAVE HAD CASE MANAGEMENT IN

22   THIS BUT I DON'T KNOW WHY I DIDN'T SET A TRIAL DATE AND I'M

23   BAFFLED BY THAT, I WANT TO CORRECT THAT TODAY.  BECAUSE THIS

24   CASE ISN'T GOING TO TRIAL FOR YEARS NOW AND I DON'T KNOW WHAT

25   HAPPENED.  I DON'T KNOW WHEN WE HAD CASE MANAGEMENT.

1       THIS CASE GOES BACK TO 2014, IS THERE A CASE MANAGEMENT

2    ORDER?

3            THE CLERK:  THERE IS, IT WAS IN APRIL OF 2015 WE HAD

4    A CASE MANAGEMENT CONFERENCE.

5            THE COURT:  AND THERE'S NO ORDER THAT CAME OUT OF IT?

6            MR. HYUN:  YOUR HONOR, IF I MAY, WE APPEARED AT THE

7    CASE MANAGEMENT CONFERENCE, THE PARTY'S COUNSEL AGREED TO DEFER

8    SETTING THE TRIAL DATE UNTIL AFTER CLASS CERTIFICATION.

9            THE COURT:  OH, OKAY, THANK YOU FOR HAVING THAT

10   RECOLLECTION.  THAT'S UNLIKE ME BECAUSE I'M SETTING IN 2019.

11   WOW.  YEAH.  SO THAT MIGHT HAVE BEEN A GOOD IDEA -- BUT I HAVE

12   300 CASES.

13       AND IF I SET TWO A WEEK, I MEAN, WE ARE GETTING TO A

14   COMPLETE BREAK DOWN OF THE SCHEDULE BECAUSE I HAVE SO MANY

15   CASES.  AND SO I'M TROUBLED BY THAT.

16       THE BEST THING I CAN DO IS GIVE YOU A TRIAL DATE NOW.  AND

17   TRY TO SEE IF I CAN WORK IT IN SOONER.  BUT THE TROUBLE I HAVE

18   IS THAT OTHER CASES DON'T RESOLVE UNTIL TOO CLOSE FOR YOU TO

19   RESET.

20       LET'S GO OFF-THE-RECORD TO TALK ABOUT SCHEDULING.

21       (OFF-THE-RECORD DISCUSSION.)

22            THE COURT:  SEPTEMBER 29TH, THAT'S AT 11:00 FOR CASE

23   MANAGEMENT.  AND THAT'S A FULL 90 DAYS, IF YOU WANT TO THE COME

24   IN THE MIDDLE OF AUGUST IF YOU THINK THAT'S A BETTER TIME TO

25   COME IN.  GETS TO BE VACATION TIME, IT'S HARD --

1          MR. MEER:  END OF SEPTEMBER IS FINE.  THAT WILL LET

2     US WORK OUT AMONG COUNSEL WHAT WE SEE THE TIME LINE MIGHT BE.

3          THE COURT:  OKAY.  THAT'S FINE.  ALL RIGHT.

4       WELL, I'M GOING TO TRY TO GET THIS ORDER OUT JUST AS SOON

5     AS I CAN.  SO THAT YOU KNOW WHAT KIND OF CASE YOU HAVE

6     OBVIOUSLY.  IF I DON'T CERTIFY THE CLASS THEN NONE OF THIS IS

7     REALLY IMPORTANT.

8       OKAY.  THEN JUST TO SUMMARIZE AND WE ARE BACK ON THE RECORD

9     HERE, I DID SET A CASE MANAGEMENT CONFERENCE ON SEPTEMBER 29TH.

10    I DO WANT A JOINT STATEMENT.

11      I'M LOOKING AT YOUR PROPOSED SCHEDULE, AND I HAVE GIVEN YOU

12    A TENTATIVE TRIAL DATE ONLY AS A PLACE SETTER IN 2018, AND I

13    AM -- AND I AM HOPEFUL THAT I WILL BE ABLE TO ADVANCE THAT

14    TRIAL DATE FOR YOU.  AND IF I'M NOT, WE WILL TALK ABOUT THAT

15    WHEN I SEE YOU IN SEPTEMBER.

16      SO THANK YOU ALL.  I GREATLY APPRECIATE THE ARGUMENT AND WE

17    WILL SEE WHERE WE GO ON THIS.

18          MR. LEE:  THANK YOU.

19          MR. MEER:  THANK YOU, YOUR HONOR.

20      (WHEREUPON, THE PROCEEDINGS IN THIS MATTER WERE CONCLUDED.)

21

22

23

24

25

1

2

3

4                    **CERTIFICATE OF REPORTER**

5

6

7

8            I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13            THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24   _____
     SUMMER A. FISHER, CSR, CRR
25   CERTIFICATE NUMBER 13185          DATED: 7/21/16

# EXHIBIT E

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ERIC CHAVEZ,

              Plaintiff,

      v.

CONVERSE, INC.,

              Defendant.

Case No. 15-cv-03746 NC

**ORDER CERTIFYING CLASS**

Re: Dkt. No. 59

      Plaintiff Eric Chavez is a former employee of defendant Converse, Inc. Chavez alleges that Converse violated the California Labor Code by (1) failing to properly calculate overtime pay; (2) not paying employees for time spent on a mandatory bag check; and (3) failing to provide proper meal breaks.

      The Court previously granted Converse's motion for summary judgment on the overtime pay claims, finding that Converse did not violate state law. Chavez now moves to certify a class on the first (California Labor Code §§ 1194, 1197); fourth (California Labor Code § 226.7); fifth (California Labor Code § 226(a)); sixth (California Labor Code § 2698); and seventh (California Business and Professions Code § 17200) causes of action. Chavez argues that Converse has a mandatory policy that requires employees to submit to a bag check while off-the-clock, and that the requirements of Federal Rule of Civil Procedure 23 are satisfied.

Case No. 15-cv-03746 NC

1   The Court agrees and finds that (1) the proposed class is numerous; (2) there are

2   common questions of law and fact among the class members; (3) Chavez's claims are

3   typical of the class; (4) Chavez and proposed class counsel will fairly and adequately

4   protect the interests of the class; and (5) the common questions of law and fact

5   predominate over issues unique to class members.

6   ## I.   LEGAL STANDARD

7   Class certification requires that: (1) the class be so numerous that joinder of all

8   members individually is impracticable; (2) there are questions of law or fact common to

9   the class; (3) the claims or defenses of the class representative must be typical of the

10  claims or defenses of the class; and (4) the person representing the class must be able to

11  fairly and adequately protect the interests of all members of the class.  Fed. R. Civ. P.

12  23(a); *Staton v. Boeing*, 327 F.3d 938, 953 (9th Cir. 2003).  Additionally, the requirements

13  of at least one subsection of Rule 23(b) must be satisfied.

14  "Rule 23 does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc. v.*

15  *Dukes*, 564 U.S. 338, 350 (2011).  Instead, a plaintiff seeking class certification must

16  demonstrate that there are sufficient facts to support his contention that class certification

17  is appropriate.  *Id.*  "[S]ometimes it may be necessary for the court to probe behind the

18  pleadings before coming to rest on the certification question."  *Gen. Tel. Co. of Sw. v.*

19  *Falcon*, 457 U.S. 147, 150 (1982).

20  ## II.   DISCUSSION

21  Chavez seeks to certify the following class: All current and former non-exempt

22  retail store employees of Converse who worked in California during the period from July

23  10, 2011, to the present.  The Court addresses each requirement for class certification in

24  turn.

25  ### A.   Numerosity

26  Here, Converse's records demonstrate that the proposed class is at least 1,532

27  employees.  The Court finds that the numerosity requirement is satisfied.

28

United States District Court
Northern District of California

Case No. 15-cv-03746 NC            2

### B.    Commonality

To certify a class, there must be questions of fact and law common to all class members, the answers to which will drive the resolution of the litigation. *Dukes*, 131 S. Ct. at 2551.

Chavez argues that all class members are required to undergo the bag checks off-the-clock. Converse does not have a policy explicitly requiring off-the-clock bag checks. *Cf. Rodriguez v. Nike Retail Services, Inc.*, No. 14-cv-1508 BLF, dkt. no. 69 (Aug. 18, 2016). However, Chavez argues that Converse's policy requires that all employees must have their bags checked by a manager at the point of the store's exit before the employee leaves. Because the time clock is always at the back of a Converse store, while the point of exit is at the front, all class members are necessarily off-the-clock when they have their bags checked. Converse disagrees and argues that each store is different and some employees are never inconvenienced by the bag check policy. The parties dispute the facts critical to assessing Converse's liability as a whole.

"A court, when asked to certify a class, is merely to decide a suitable method of adjudicating the case and should not turn class certification into a mini-trial on the merits." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015). "'[W]hether class members could actually prevail on the merits of their claims' is not a proper inquiry in determining the preliminary question 'whether common questions exist.'" *Stockwell v. City & Cty. of San Francisco*, 749 F.3d 1107, 1112 (9th Cir. 2014) (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011)).

For the purposes of class certification, the Court finds that Chavez has demonstrated that most, if not all, Converse stores are set up such that an employee would necessarily be off-the-clock when a bag check occurs. Thus, there are common questions of fact and law and that the answers to those questions will drive resolution of the litigation.

### C.    Typicality

For purposes of the typicality inquiry, the named plaintiff's injuries need not be identical with those of the other class members, "only that the unnamed class members

United States District Court
Northern District of California

have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of conduct." *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) ("representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical.").

Here, Chavez has submitted a declaration and evidence establishing that he worked at Converse during the class period. Although Chavez left employment with Converse in 2015, Converse acknowledges that it has not changed its bag check policy since then. Chavez attests that he was stopped multiple times for a bag check after he clocked out, and the check often took several minutes. Converse argues that Chavez's experience is not typical because Chavez was singled out by his manager and made to wait longer than usual.

The Court concludes that Chavez's injuries are typical because he has established that he was subjected to a bag check off-the-clock. The duration and frequency of the bag checks relates to Chavez's damages claim, not liability. Thus, Chavez has demonstrated typicality.

### D. Adequacy of Representation

Proposed class representatives and their counsel cannot have conflicts of interest with the class and must vigorously prosecute the action on behalf of the class. *Hanlon*, 150 F.3d at 1020.

Here, Chavez seeks to have Larry W. Lee and Nick Rosenthal of the Diversity Law Group, P.C., Dennis S. Hyun of Hyun Legal, APC, and William L. Marder of Polaris Law Group LLP as Class Counsel. Chavez and his counsel have provided their declarations that they do not have conflicts with the class and that they will fairly and adequately protect the interest of the class. The Court finds that Chavez is an appropriate class representative and that counsel will adequately represent the class.

//

**E.    Rule 23(b)**

Chavez seeks certification under Federal Rule of Civil Procedure 23(b)(3).  Rule 23(b)(3) requires two separate inquiries: (1) whether issues common to the class predominate over issues unique to individual class members; and (2) whether the proposed class action is superior to other methods available for adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

Here, the overarching question of whether Converse fails to compensate employees for bag checks, and whether such failure is a violation of the California Labor Code, predominates the issue of how much each individual class member waited off-the-clock for a bag check.  Additionally, because the proposed class is over 1,000 individuals, a class action is the most efficient method of adjudicating the controversy.

## III.  CONCLUSION

The Court GRANTS Chavez's motion for class certification and makes the following rulings:

1. The Court certifies the following class: "All current and former non-exempt retail store employees of Converse who worked in California during the period from July 10, 2011, to the present."

2. The Court appoints Chavez as a class representative.

3. The Court appoints Larry W. Lee and Nick Rosenthal of the Diversity Law Group, P.C.; Dennis S. Hyun of Hyun Legal, APC; and William L. Marder of Polaris Law Group LLP as Class Counsel.

4. The proposed class period is from July 10, 2011, through the date judgment is rendered.

5. The parties must meet and confer about class notice.

6. By October 28, 2016, the parties must file a stipulated proposed order with

(1) the method of obtaining class member contact information; (2) the method of

Case No. 15-cv-03746 NC                    5

United States District Court
Northern District of California

1   notice; (3) a copy of the actual notice; and (4) the timeline and procedure for

2   opting out or opting in to the class. If the parties cannot agree on a stipulated

3   order, they must submit a joint letter brief of no more than 5 pages stating the

4   basis of disagreement.

5   7.   A further case management conference is set for November 9, 2016, at 10:00

6        a.m. with an updated case management statement due on November 2, 2016.

7   **IT IS SO ORDERED.**

8

9   Dated:  September 22, 2016                    _____

10                                               NATHANAEL M. COUSINS
                                                 United States Magistrate Judge